## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Tyjuan Anderson, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No: 15 C 50065 |
| | ) | |
| City of Rockford, et al., | ) | |
| | ) | |
| *Defendants*. | ) | Judge Frederick J. Kapala |

## ORDER

Palmer's motion for summary judgment [210] is granted. Rockford police officers' motion for summary judgment [215] is granted. City of Rockford's motion for summary judgment [217] is granted. All other pending motions [166] [190] are denied as moot. This case is closed.

## STATEMENT

    Plaintiffs, Lumont Johnson, Anthony Ross (a/k/a "Little Daddy"), and Tyjuan Anderson (a/k/a "Ace"), have sued defendants, Rockford Police Officers Doug Palmer, Dominic Iasparro, Joseph Stevens, James Randall, Scott Mastroianni, Theo Glover, Kurt Whisenhand,[1] Torrey Regez, Brad Larson, and Elizabeth Grindley, as well as the City of Rockford under 42 U.S.C. § 1983.[2] Plaintiffs allege various civil rights violations in connection with their purported wrongful murder convictions. Before the court are motions for summary judgment filed by defendants. For the reasons that follow, the motions are granted.

## I. FACTS[3]

    At about 2:51 a.m. on April 14, 2002, eight-year-old Demarcus Hanson was killed by bullets fired though a window as he slept in a house at 2514 Chestnut Street in Rockford, Illinois belonging to his grandmother Estelle Dowthard. Later that day, when officers interviewed Demarcus' uncle, Alex Dowthard, he initially claimed that he had no information about his nephew's killers and that he had been with his girlfriend the previous night. Dowthard later admitted that he and an unnamed

---

[1]Plaintiffs' motion to voluntarily dismiss defendant Whisenhand is granted and he is terminated from these cases.

[2]Gregory Lindmark was also named as a defendant but he was terminated from this case on November 30, 2015.

[3]The facts are taken from the pleadings, the parties' statements of undisputed facts, the parties' responses thereto, the parties' statements of additional facts, and the evidence submitted in support. The facts are undisputed unless otherwise indicated.

individual were in his 1988 Chevrolet Monte Carlo and exchanged gunfire with plaintiffs who were in a white Chevrolet Suburban. At that point, however, Dowthard claimed that the unnamed individual, later determined to be Lataurean Brown, was the person who fired at the Suburban. Dowthard said that he hid the gun under a car in his mother's driveway on Chestnut Street, but that he was not present for and did not know who shot at Demarcus' grandmother's house. Dowthard was taken into custody on a parole violation.

Palmer and Stevens interviewed Brown on April 24, 2002, and he did not indicate who shot Demarcus. Next, Palmer and Stevens met with Dowthard at Big Muddy River Correctional Center ("Big Muddy") on May 2, 2002. Dowthard again claimed that he knew nothing about the murder.

On May 9, 2002, officers obtained a written statement from Brown that implicated plaintiffs in the shooting and provided in pertinent part:

My name is Lataurean Brown, but people call me Johnny Boy. On Saturday night and into Sunday morning on April 13th and April 14th, I met up with my friend Alex Dowthard on Parmele Street where he was staying at. After we met up we went to Lamonts on 15th Avenue. I drove Alex's car to the club. The car is a purple Monte Carlo with loud mufflers. We got to Lamonts and went inside. There wasn't any problems at Lamonts and I didn't see L[u]mont, Lil Daddy or Ace there. At about closing, we left and I drove to the liquor store on South Main Street. The liquor store is the one with the gravel parking lot. I parked on the street just a little ways from the door and I was sitting on the hood of the car talking to some girls. I don't remember the names of the girls. Alex was standing next to the car talking to a girl. Alex was in the street and he was throwing up G.D. and then a white and blue Suburban drove up and stopped. Lumont was driving, a younger light skinned guy was in the front seat, Lil Daddy was sitting behind the driver and Ace was sitting behind the passenger. When the Suburban stopped Ace started talking and saying what does that mean asking about the gang signs. I was still talking to the girls and I was listening to both the girls and Alex but I heard Ace calling Alex a bitch, pussy and a motherfucker. Alex said something back but I don't remember what he said. I saw Lil Daddy get out when they stopped talking and he was standing in the door frame and raised up over the top of the truck. At that time I didn't know what he was doing but he looked down the street and I assumed a squad car was coming so he got back into the Suburban and they drove off.

After a minute Alex said lets go and we drove off also. We turned on Loomis and headed back towards M and M Market on West Street. We took a right on Montague and then left on Rose Street and Alex wanted me to stop at a white house on Rose. I was still driving.

Alex went inside and came back out after about five minutes and I don't know what he was doing in there. After he came out we headed up Central to Chestnut where we turned right and went to Tay Street. We took a left and headed up Tay Street and as we turned we saw the Suburban turning on Tay and coming in our direction. We had the T-Tops off on the car and as we got close to the car, Alex

stood on the seat and started shooting a handgun that he had. I don't know where he got it and I didn't know he had it until he started shooting. The gun didn't have any clips, it had a wheel where the bullets were. Alex shot at the Suburban and this Suburban was the same Suburban that Lumont, Lil Daddy, Ace and the light skinned guy were in but when Alex started shooting I just concentrated on driving and getting out of the area I didn't see who was in the Suburban. I didn't know Alex was going to shoot but when he did I got scared and I drove up to West State and turned left. Alex had shot about four shots.

When I turned left on West State, Alex told me to turn left on the street next to the school. After talking to Detective Stevens and Palmer I know that street is Waldo Street. We headed down Waldo and headed to the stop sign at Chestnut. Between Tay and West State and Chestnut and Waldo, I saw Alex reloading the gun. He was putting the bullets in one at a time.

We stopped at the stop sign and saw that the Suburban was coming towards us on Chestnut so Alex started shooting at them again through the T-Top. I kept going straight and made a right on Green Street. I drove to Central and then turned right on Central. I headed up Central to West State and then turned left on West State Street. Alex told me to drive to his mother[']s House on Chestnut. I knew where the house was at so I drove to Johnston then took a left and went to Chestnut and turned right. I stopped the car on the wrong side of the road right in front of the driveway.

Alex got out and ran to the Ford Taurus in the driveway and put the gun up under the car. I don't know why he did that. Alex started walking back to the car and then he stopped and said, "oh shit, there them niggas." Alex started running towards the back of the house away so I drove off. Before I drove off, I saw a red Pontiac pull up almost next to me on the other side of the road. I looked over and saw Lumont driving, Ace in the front seat, and Lil Daddy in the back seat. They didn't have their hoods up then. I took off towards Henrietta and looked in the rearview mirror and saw Lil Daddy and Ace getting out and chasing Alex toward the back of the house. I turned right on Henrietta and stopped a little ways up the block. I got out and started looking for Alex but was staying by the car. After a short time I saw Alex start running towards me from behind the house next to his mother's house. He kept running and when he was in the middle of the intersection, I heard four gunshots from by his mother's house. The shots were one right after the other. Alex got to the car and got in and we drove and took a left on West State Street. I never saw the red car or those [sic] again.

Alex told me to drive to Concord Commons . . . .

On May 31, 2002, Lindmark and Glover went to Big Muddy and obtained a written statement from Dowthard in which he implicated plaintiffs in the shooting. Dowthard's statement provided in pertinent part:

My name is Alex Dowthard.  I want to tell the truth about what happened at my mother (Estelle Dowthard's House) (2514 Chestnut Street) the night my nephew Demarcus Hanson was killed.

The night Demarcus was killed I had an earlier altercation with Anthony Ross, Lumont Johnson and a dude who's name is 'Ace.'  I do not know Ace['s] real name.  When these altercation[s] happened I was with my friend Johnny, I do not know Johnnie's real name but I identified him from a photo that was shown to me by Sgt. Lindmark.

Johnny and I were riding in my 1988 Monte Carlo, Johnny was driving.  The first altercation I had was when Johnnie and I went to the liquor store on South Main St.  It was about 2:00 a.m.  Johnnie and I parked in front of the liquor store and got out of the car.  We looked up and saw Lumont Johnson in traffic driving his white suburban with blue graphics towards us.  I saw a light skinned black male riding in [the] front passenger seat with Lumont.  Anthony Ross was in the rear seat behind Lumont and "Ace" was sitting behind the light skinned black male who I did not know.

Lumont stopped the suburban beside my purple and blue Monte Carlo and words were exchanged between me and Anthony Ross and 'Ace.'  'Ace' rolled his window down and said something, and Anthony Ross who I call 'Lil Daddy' opened his door and stood outside and said something smart.  After we exchanged words, Lumont drove off.  A crowd had gathered around the liquor store, everybody left after we exchanged words.  Johnnie and I got in my car and we drove up by M&M Market which is located on the corner of West and Montague St.  We saw Lumont [and] them again at M&M Market 'Lil Daddy' yelled at me and called me a 'bitch' then Lumont drove back towards South Main St.  I told Johnnie to head for the westside towards Catfish City.

Before we got to Catfish City I had another altercation with Lumont [and] them at Chestnut and Tay Street.  After the altercation at Chestnut and Tay, I told Johnnie to head to my mother's house on Chestnut Street.

We arrived at my Mom's house and Johnnie parked in front of the house on the wrong side of the street.  I got out [of] my car and put something up.  After I put something up, I walked back towards my car and I saw a red mid-size car pull alongside my car and stop in the middle of the street.  The cars doors opened and I recognized Lumont Johnson, Anthony Ross (Lil Daddy) and Ace all get out of the car.  I do not know who was driving the car, because they all got out so fast.  I heard one of them yell, "there he go" and somebody said "go that way."  I saw Lumont Johnson with a chrome handgun and Anthony Ross (Lil Daddy) had the same type of gun Lumont had.

I turned and ran to the rear of my Mom's house from the front driveway of my mother's house.  'Ace' was chasing me while Lumont and Anthony Ross (Lil Daddy) ran around the opposite side of the house to try and cut me off.  As I ran by

4

the garage which is located behind my mother's house, I heard 4 or 5 gunshots coming from the right side of my mom's house which would be the westside of the house.

When I heard the shots I stopped near the end of the garage and waited for about 30 seconds, then I looked on the westside of my mother's house and I saw Lumont Johnson and Anthony Ross (Lil Daddy) running from the westside of my mom's house back towards the car they got out of.

I was able to see Lumont and Anthony Ross because I had moved from the rear of the garage towards the front which allowed me to see Lumont and Anthony (Lil Daddy) running. I don't know where 'Ace' was but I know he did not see me because I had a head start on him. After I saw Lumont and (Lil Daddy) running, I made my way through the rear yard of my mom's house and ended up by my Dad's house on Henrietta.

Johnnie drove my car toward the corner and picked me up by my Dad's house on Henrietta. Johnnie and I drove to Concord Commons to try to use a phone. . . .

. . . .

[M]y nephew Jeffrey Moore came over and told me Demarcus had been shot and everybody was at the hospital. Later on that day I came down to the police station to talk to detectives.

I originally thought I could handle this myself, that's why I did not cooperate at first. I'm now willing to cooperate because I want the guys who did this to my nephew arrested. I have not been offered anything by the police department for my cooperation. I feel bad for my family I just want this to be all over.

Plaintiffs were charged with Demarcus' murder on June 30, 2002.

On July 11, 2002, Palmer and Stevens obtained a written statement from Antonio Leavy which primarily described his involvement with conflicts between Waco and Moe (also known as P. Stones) street gang members which took place before Demarcus was murdered. The written statement was filed under case number 02-073667, rather than 02-048075, the case number of the Demarcus Hanson homicide investigation. In that portion of his statement dealing with the shooting of Demarcus, Leavy stated:

The next thing that happens is Demarcus was shot and killed. On that night I was home and heard four gunshots. I got out of bed ran downstairs and looked out of the front window. I saw a red Grand Am. . . . I saw a heavy set black male driving and he was sitting up some.

. . . .

[Brown] told me what happened and he said that he and [Dowthard] were at the club and they pulled off and went to the liquor store. [Dowthard] was throwing up forks and Ace, Lil Daddy, and Lumont pull up. Ace asks what that meant and [Dowthard] told him that it meant gangster. That was all [Brown] told me. After [Brown] told

5

me that and after all that has been going on with the Moes and the Wacos I figured it was them that was probably involved in Demarcus' shooting.

On August 27, 2002, Stevens and Palmer obtained a written statement from Casel "Café" Montgomery which provided, in pertinent part, that in the early morning hours of April 14, 2002, "Lil Daddy chirped me" and then borrowed Montgomery's rented red Pontiac Grand Prix. When Montgomery woke up the next day, his red Grand Prix was out front with the keys in it. Later that day, Lil Daddy told Montgomery that "he saw them Niggas last night and he got to busting at Alex. Lil Daddy said that Alex's gun jammed and he threw it. Lil Daddy said he just kept shooting." When Montgomery told Lil Daddy that he killed a kid, Lil Daddy said that "he wasn't trying to kill the kid, he was trying to kill his Mama." According to Montgomery, a day or two later Lil Daddy told Montgomery that he had been talking to the police and that Montgomery should get rid of the red Pontiac. Montgomery and his girlfriend turned in the red Pontiac for another rental car.

On September 12, 2002, Stevens obtained a written statement from Ross' cousin Sonya White in which she swore:

> Back a few months ago I was at my mother's house and I had been outside hanging out. It was in the early morning, it wasn't light out yet, but you could tell the sun was coming up. My cousin is Lil Daddy or Anthony Ross and he came over in a maroon older two door car and stopped at my mother's house. He got out and talked to me for a second. He was acting weird, he was pacing and kept grabbing his head and stuff. I told him we could ride and smoke for a while. We got into the car and drove to Levings Lake which is just down the road. We got to Levings Lake and he drove around the lake to the building on the north shore. We got out and walked into the building and Lil Daddy had a gun in his waistband. We walked into the building and Lil Daddy started talking about how he wish[ed] he could turn back time. He said he didn't want to do it. I asked him what and he told me that I would hear about it on the news. Lil Daddy then pulled out the gun and threw it in the lake. I saw the gun and asked him if he shot somebody and he lowered his head and nodded. Lil Daddy told me they were "into it with some niggas" and they wanted to take over the block. Then he started crying. I held him and I asked him what he was going to do. He told me he didn't know. We talked about God and he asked me if I had any money. I gave him two hundred dollars and then he drove me home. He dropped me off and then left and I don't know where he went. A couple days later I heard on the news that a little boy was killed and that[']s when I knew what Lil Daddy had done.

Johnson and Anderson were tried together in October 2002. Ross was tried separately in February 2004.

**A. Johnson and Anderson's October 2002 Jury Trial**

Judge Gerald F. Grubb presided at the jury trial of Johnson and Anderson. Assistant State's Attorney Scott Salemi represented the State. Attorney Randy Wilt and Public Defender Karen Sorenson represented Johnson and Anderson, respectively. The trial was scheduled to begin on October 21, 2002. At a pretrial hearing held on that date, Wilt addressed Johnson's motion to continue the trial. Wilt indicated that on October 17, 2002, the prosecution came into possession of

6

recordings of Dowthard's telephone conversations while he was incarcerated at Big Muddy ("Dowthard tapes") which predated Dowthard's May 31, 2002 written statement. Wilt informed the court that the Dowthard tapes were made available to the defense on Friday, October 18, 2002, and that thereafter he and the other two defense attorneys spent two hours listening to one-and-a half tapes.[4] Wilt explained that they needed to listen to the rest of the tapes which could contain exculpatory information, and that they could not do so if the trial started that day. The State did not object to Johnson's motion. Judge Grubb suggested that they delay the trial by one-week, but still pick a jury and have them return on October 28, 2002. Sorenson objected, stating that she did not think a week was enough time and that she could not pick a jury without knowing what was on the Dowthard tapes. Judge Grubb ordered the State to turn the original Dowthard tapes over to the defense and, despite Sorenson's concerns, said that they would pick a jury and have them come back on October 28, 2002, to start the trial.

At trial, after testifying consistently with the facts set forth in his May 31, 2002 written statement, Dowthard explained that he did not tell the police what he knew right away because he was on parole and knew that he was not supposed to be around violence or have a gun. During his initial interview with police, Dowthard made up a story to distance himself from the shooting, although he eventually did admit that they possessed a gun and fired it, and that he had put it up under a car at his mother's house. Dowthard explained that he did not tell the police the truth until he was in Big Muddy on a parole violation due to his possession of the firearm. When detectives came to Big Muddy, he gave them a statement without asking them for anything in return. However, after he gave his statement, Dowthard asked the detectives to take the parole hold off of him and one of the detectives said he would have to talk to the Parole Board. According to Dowthard, he did not get out of Big Muddy any earlier than he otherwise would have.

On cross-examination, Dowthard confirmed that the first time he met with the police on April 14, 2002, he lied to them when he told them that he was with his girlfriend and that he had no knowledge about how Demarcus was killed. Dowthard also agreed that after the police told him he was going to have to submit to a gun powder residue test, he told them that he possessed a gun and fired it. Dowthard agreed that Palmer and Stevens came to see him at Big Muddy on May 2, 2002, and he refused to speak to them. About a week later, Dowthard was served with a criminal warrant for forgery which also became another basis to revoke his parole. On May 30, 2002, Dowthard had a telephone conversation with Glover and Lindmark during which he agreed to talk with detectives if they would agree to notify the State's Attorney's Office and the Parole Board that he cooperated. Dowthard said that he gave his written statement implicating plaintiffs in Demarcus' murder on May 31, 2002, which was the second time detectives, this time Lindmark and Glover, came to see him at Big Muddy. Dowthard agreed that he asked the detectives to release him from the parole hold, but Dowthard explained that the detectives said that they could not make any promises. Dowthard denied that the detectives promised to have the forgery charge dismissed, but Dowthard agreed that the charge was ultimately dismissed on July 31, 2002, and that the State's Attorney's Office sent a letter informing the Parole Board of the dismissal. On re-direct examination, Dowthard denied that

_____

[4]The third attorney was Robert Fuenty who represented Ross at the time.

any officer told him what to say in his statement or that any officer told him he had to implicate plaintiffs.

Brown testified that, after Dowthard fired from the Monte Carlo, Dowthard directed him to drive to his mother's house. According to Brown, he curbed the car on the wrong side of the street in front of the house and kept the engine running. Dowthard exited the vehicle, walked up the driveway, placed his gun under the gray Ford Taurus in the driveway, and walked back toward the Monte Carlo. With that, Dowthard said, "Oh shit, here come them niggers," and he ran toward the house. Brown looked to his right and saw Lumont, Ace, and Lil' Daddy in a red car. Brown drove away in the Monte Carlo and saw Ace and Lil' Daddy running after Dowthard in his rearview mirror. Brown eventually stopped the car and saw Dowthard running toward him. Brown heard four gunshots as Dowthard reached the intersection of Chestnut and Henrietta Streets. Dowthard got into the Monte Carlo, and Brown drove to Concord Commons. Brown did not learn that Demarcus had been killed until later that morning. On April 24, 2002, Brown spoke to the police at his cousin's house and also at the public safety building. Brown admitted that he initially lied to the police. Brown disclosed to the police that Dowthard shot at the Suburban, but he did not say who shot at the house in retaliation. In May 2002, Brown gave a statement to the police which intimated that Ace, Lumont, and Anthony were responsible for Demarcus' death.

Larson testified that he was on duty when Anderson and his brother, Terrance Anderson, were being held in adjacent cells following the crime. Larson overheard Terrance instruct defendant not to say anything to the police. Larson then heard Anderson respond, "It's okay man. I'll just do the 20 years and be out." Apparently, Grindley was also present as she is mentioned in Larson's report on the incident. During defendants' case at trial, Terrance denied that the conversation between him and Anderson ever took place.

Johnson testified on his own behalf at trial. Anderson did not. Johnson explained that he, Anderson, Javarus (presumably the light-skinned male), and Ross saw Dowthard and Brown near the Monte Carlo. Dowthard displayed a gang sign and Anderson asked, "what that was about." Johnson dropped Ross off where his Cadillac was parked near the intersection of Tay and Chestnut Streets and then dropped Javarus off at his house. Johnson and Anderson, who were in Johnson's Suburban, followed Ross in his Cadillac. The two vehicles encountered the Monte Carlo at the intersection of Tay and Chestnut Streets. The Monte Carlo paused at the stop sign and turned toward the Suburban. Johnson heard gunshots, turned onto Chestnut Street, and parked near Ross, who had also stopped. Johnson recognized the Monte Carlo, but he did not see the driver or the shooter. Johnson testified that he checked the Suburban for bullet holes but did not find any. Montgomery pulled up in a red Grand Am or Grand Prix and parked behind the Suburban. Johnson asked Ross whether he heard gunshots, and Ross answered "no." Johnson and Anderson drove to Anderson's house and Ross and Montgomery remained on Chestnut Street. Anderson's family members testified that Anderson and Johnson arrived between 2:00 and 2:30 a.m. The next day, Johnson learned that a police officer was looking for him. Johnson called the officer, went to the public safety building, and spoke with the police that day and the next.

Johnson and Anderson argued that Montgomery and Kefentse Taylor were actually the shooters. The jury rejected this argument and found Johnson and Anderson guilty. In their post-trial motions for new trial, Johnson and Anderson raised, among other issues, their late access to the

Dowthard tapes. The motions were denied and Judge Grubb sentenced each to 50 years' imprisonment.

## B. Ross' February 2004 Jury Trial

Judge Joseph McGraw presided at Ross' trial, the State was represented by Mark Karner, and Ross was represented by Jeffrey Kline. Dowthard and Brown testified consistently with their written statements and their testimony at the jury trial of Johnson and Anderson.

Sonya White was called by the State and testified that a couple hours before daylight, just before she heard about the Hanson murder on the news, her cousin Ross stopped by her mother's house looking frantic and worried. White and Ross rode in Ross' car down the street to Levings Lake where Ross said that "he wished that he could turn back time," and that "he was into it with some niggers over some block territory." Ross then threw a gun into the lake. White testified further that she asked Ross if he shot someone and Ross held his head and nodded yes. White acknowledged that she was awaiting sentencing on a pending attempted home invasion charge. However, White testified that she volunteered the information about Ross, no promises were made to her, and she did not expect anything in return.

During his case at trial, Ross testified to his whereabouts at the time of the murder and denied any involvement. Toni Gulley testified that in April 13, 2002, she was living with Ross, who was her boyfriend, and their baby. Gulley testified that Ross got home at about 2:45 a.m. on the morning of April 14, 2002, while she was changing her baby's diaper. When asked how she could be sure of the time, Gulley said because she looked at the clock on her digital cable box. On cross-examination, Gulley denied telling Detectives Cone and Jimenez on April 24, 2002, that she could have been off on the time by as much as a half-hour.

The jury found Ross guilty. Thereafter, Judge McGraw sentenced Ross to 50 years' imprisonment. Plaintiffs' convictions and sentences were upheld on direct appeal. See People v. Anderson, 367 Ill. App. 3d 653 (2006); People v. Johnson, No. 2-04-0395 (2005) (unpublished order under Supreme Court Rule 23); People v. Ross, No. 2-04-0391 (2006) (unpublished order under Supreme Court Rule 23).

## C. Postconviction Proceedings

In their amended petitions for postconviction relief, plaintiffs brought numerous claims including actual innocence based on a host of individuals coming forward including Palmer, who admitted his and other officers' misconduct; White, who admitted that her trial testimony was false; and Rickedda Young, who stated Brown and Dowthard told her that they did not know who the shooters were minutes after the shooting. Each plaintiff requested outright reversal of his conviction based on his actual innocence or, alternatively, vacature of his conviction followed by a new trial.

The postconviction petitions were supported by various affidavits including an October 28, 2007 affidavit in which White swore in pertinent part that:

3. In September 2002, I was arrested for home invasion.

4. When I was arrested, Detective Stevens asked me if I knew about the case they had on Anthony Ross. Even though I knew absolutely nothing about it, I told

Detective Stevens that I did know about the case. Detective Stevens told me that if I could help them, they could help me.

5. On September 12, 2002 I gave a false statement to the police about Anthony Ross. I gave the statement because I thought I could get a deal on my home invasion case.

6. The only things that are true in my statement are my name and where I was living at the time. I made up everthing else.

7. I also testified at Anthony's trial. My testimony was false.

8. Anthony was not outside with me on April 14, 2002. Anthony never told me any of the things that I said that he told me. Anthony never threw a gun in Levings Lake.

9. I had no idea what happened in this case. As far as I know, Anthony had no involvement in it whatsoever.

10. I gave false testimony at Anthony's trial because of my home invasion charge. We had talked about my testifying at Anthony's trial and I felt like I had to follow through for my plea.

11. I am coming forward now to tell the truth because what I did was wrong and has been eating at my soul.

Toni Gulley swore in her November 28, 2007, affidavit that:

3. On April 14, 2002, I was changing my baby's diaper and getting ready to feed her when Anthony came home. It was around 2:45 a.m.; I remember looking at the time on the digital cable box in my room.

4. I was interrogated by the detectives multiple times regarding the murder of Demarcus Hanson on April 14, 2002.

5. During those interrogations, I remember the detectives trying to get me to say that Anthony came home at 6:00 a.m. the night of the murder, and not at around 2:45 a.m., as I had told them. I specifically remember Detectives Palmer and Randall ("JR") trying to get me to say this.

6. In addition, Palmer harassed me at work, and Palmer and JR threatened to call DCFS and take my baby away if I did not cooperate. Palmer and JR also harassed me outside the courthouse, saying hurtful things like, "Who's going to take care of your daughter?" or "You need a daddy?"

7. After being threatened that my baby was going to be taken away, I may have told the police that I could have been off by a little on the time that Anthony came home.

. . . .

10. After the first time I gave testimony at the Grand Jury, I was scared to testify again at the Grand Jury.

11. In addition, my experience at the grand jury plus the police threatening and intimidating me all made me very nervous about testifying at Anthony's trial. I really didn't want to be involved.

12. I told Anthony's attorney, Jeff Kline, about my experience with the State's Attorney and testifying before the grand jury. I also told Jeff Kline that Palmer told me to say that Anthony came home at 6:00 a.m.

Charles Griffin stated in a July 2, 2008 affidavit that he is serving a 20-year sentence for murdering Taylor. According to Griffin, in the late spring and summer of 2002, when he and Taylor were "locked-up in the Winnebago County Jail," Taylor told Griffin that he and Montgomery "was [sic] trying to get at Alex." When Griffin tried to inform the police, they told him "that if [his] information [did not implicate] [Lu]Mont, Lil' Daddy, and Ace, they did not want to hear it." Griffin also stated in his affidavit that after he was released, he and Taylor were riding in a car and he asked Taylor who was there when Demarcus was shot. Taylor said it was just him and Montgomery. Griffin asked Taylor this question because he wanted to kill everyone who had something to do with Demarcus' killing. Griffin added that because the police would not do anything he had to take matters into his own hands and the only reason he did not kill Montgomery as well was because Montgomery was in prison.

Montgomery swore in a July 18, 2011 affidavit that "Doug Palmer told me to say that Anthony Ross chirped me and needed to borrow my car, but that never happened. Anthony Ross never had my car that day. The only reason I did it is because Palmer threatened me with murder charges . . . physical force and incarceration." On the same date, Montgomery testified at the postconviction evidentiary hearing that his girlfriend rented a red Pontiac Grand Prix on April 11, 2002, and they returned it on April 15, 2002. Montgomery acknowledged that he told the police that Ross "chirped" him on the morning in question and asked to borrow the red Pontiac and that he let Ross borrow the car. However, Montgomery said this was not true. When cross-examined about the specifics of his August 27, 2002 statement, Montgomery repeatedly said "I don't remember."

Bryce Croft testified that he was in the Winnebago County Jail in the summer of 2002 on a drug charge. Croft acknowledged that he was in tier upper C with Ross and spoke to Ross about his murder charge. Croft's conversation with Ross was one to three days before Croft asked to speak to the police regarding Demarcus' murder. On July 29, 2002, Croft met with Palmer and told him that he saw Taylor and Montgomery leave in a red Grand Prix on the early morning of April 14, 2002, with a Ruger P89 handgun, and when he saw them later at a house, Taylor dropped an empty clip from the gun onto the floor. Later that summer, Palmer came and got Croft out of jail, threatened him with perjury charges, and said that what Croft told him the first time was not true and that he knew that Ross had put Croft up to it. Croft said that Palmer gave him a pre-written statement and told him to sign it and initial it, and that Croft did not read the statement. In this statement which was dated October 16, 2002, Croft stated that he made up the story which he had previously told Palmer at Ross' request. At the evidentiary hearing, Croft testified that the October 16, 2002 statement was not the truth and his July 29, 2002 statement was true because he had no reason to lie.

White testified that in September 2002, she was taken into custody for questioning about a home invasion and Stevens asked her if she heard about Demarcus' murder. White said that although she did not know anything about the murder or Ross' involvement, she told Stevens that on the morning of the murder Ross nodded his head when she asked him if he had shot someone and Ross threw a gun into Levings Lake. White testified that this was not true. White testified that she made up the story so she could get out of trouble. When asked how she came up with the information in her statement, White said:

> A. Well, when the detectives was [sic] questioning me they asked me about it, and I just went off what they were saying.
>
> . . . .
>
> Q. Did the detectives provide you with information about the murder?
>
> A. In some sorts that's how I find [sic] out about it.

When asked to explain how the detectives provided her with information about the murder, White said:

> A. They asked me did I know about it and did I know about any of the guys that they questioned me about.
>
> Q. And what did you tell the police in response?
>
> A. I told them I just knew Anthony.

White said that her testimony at Ross' trial was not true, and that she made it up because she thought the police would be able to help her with her home invasion case. White conceded that she did not in fact get any consideration for her testimony at Ross' trial. White agreed that on March 24, 2003, she entered into a cooperation agreement with the State which provided that she would testify against her co-defendants on the home invasion charge and in exchange she would be allowed to plead to a probationable reduced charge of attempted home invasion. White also agreed that the cooperation agreement did not contemplate her testimony against Ross at his trial. White further agreed that she did not comply with the conditions of her cooperation agreement, her bond was revoked, and she was in custody awaiting sentencing on her attempted home invasion charge at the time she testified at Ross' trial. In fact, White agreed that at Ross' trial, attorney Kline asked her if she had an agreement worked out regarding Ross' case and she denied it saying she would not have spent the last nine months in jail if she had such an agreement. White agreed further that part of paragraph 10 of her affidavit was false. Specifically, that it was not true that her reason for testifying falsely at Ross' was "because of [her] home invasion charge."

Young testified that in the early morning hours on April 14, 2002, she was staying at Concord Commons when her cousin Brown and Dowthard banged on the door. According to Young, both men said that "some niggers were shooting at [them], but [they] didn't know who." Although she was not sure when, thereafter Young was questioned by two white officers and told them that Brown and Dowthard said "some niggers were shooting at them and they didn't know who it was."

When Palmer was called by plaintiffs at the postconviction evidentiary hearing, he explained that he resigned from the Rockford Police Department in 2004 after he was falsely accused of

fathering the child of a confidential informant and having an affair with another informant. Palmer said that he and Randall first interviewed Dowthard on April 14, 2002, and Dowthard did not implicate anyone in the shooting. Palmer said he spoke to Dowthard in May 2002, this time at Big Muddy where Dowthard again failed to implicate anyone in the shooting.

Palmer also testified that the first time he and Stevens interviewed Brown on April 24, 2002, Brown did not identify anyone that he saw at Dowthard's mother's house. Instead, Brown said Dowthard had a verbal confrontation with plaintiffs, thereafter Dowthard shot at plaintiffs, and then Dowthard hid the firearm under a car at his mother's house. Palmer testified that he and Stevens threatened Brown by telling him that he could be charged with obstructing justice if he did not cooperate. A couple weeks later, in May 2002, Palmer and Stevens again spoke to Brown, they made the same threat, and Brown gave a written statement indicating that plaintiffs came to Dowthard's mother's house and he heard shots after he drove away from the house. When asked if he "fed" Brown any of the information contained in Brown's statement, Palmer said that the part indicating that Dowthard and Brown stopped at M&M market did not come from Brown. Palmer explained that he fed this information to Brown because it corroborated the information that Dowthard had provided.

Palmer testified further that he and Randall initially interviewed Toni Gulley on May 16, 2002, at the police station when Gulley said that Ross arrived home at 2:45 a.m. on the morning in question. Palmer said that in an effort to get Gulley to state that Ross came home at a later time, he told Gulley that she had to have been mistaken about the time and threatened to call DCFS and report her for child neglect. Palmer also testified that he later repeated the threat when he spoke to Gulley at Gulley's workplace and then at her apartment.

Palmer also testified that he made up those portions of Croft's October 16, 2002 statement that retracted his July 29, 2002 statement suggesting that Montgomery and Taylor were the shooters. According to Palmer, when he shared the information in Croft's July 29, 2002 statement with Lindmark, Stevens, and Randall, Lindmark instructed him to make a liar out of Croft. Palmer said that on October 16, 2002, he wrote out the statement, told Croft to sign it, and Croft signed it without reading the statement. Palmer did not testify that he threatened to bring perjury charges against Croft if he did not sign the October 16, 2002 statement.

Dowthard was called as a witness at the postconviction evidentiary hearing. When asked about Demarcus' shooting, Dowthard invoked his Fifth Amendment right against self-incrimination.

Judge McGraw entered a memorandum of decision on March 19, 2013, granting in part plaintiffs' postconviction petitions. Judge McGraw began by rejecting all of plaintiffs' claims based on the testimony of Palmer:

> The Court finds that former Detective Palmer's testimony was in no small measure, incredible and unbelievable. Former Detective Palmer, through his words, actions and timing of his "disclosures" cast a pall over the credibility of his latter day revelations. This Court did not find Detective Palmer to be reasonable or credible and discounts, almost entirely, everything he had to say.

It is important to note that the officers who testified, to refute or rebut Detective Palmer's contentions were, conversely, credible and reasonable.

Accordingly, any claim based on Detective Palmer's testimony is without adequate support and the Petitioners fail on those claims.

Next, Judge McGraw found unpersuasive the lay witness testimony presented during the evidentiary hearing. He specifically determined that "any claim grounded or based upon the believability of that testimony must likewise fail." However, Judge McGraw did find meritorious plaintiffs' postconviction claims that they were deprived of an adequate opportunity to utilize the Dowthard tapes at trial. After deeming it a "one-witness case," Judge McGraw wrote:

> The attorneys (Wilt, Kline and Sorenson) did not have timely access to those recorded conversations, so as to utilize those recorded conversations to shed light upon the truthfulness, or lack of truthfulness, of Dowthard's various evolving statements. Without assigning blame, this Court is unclear why the audiotapes of the recorded conversations of the witness, while at Big Muddy Correctional Center, were turned over to the defense on the virtual eve of trial, just days before jury selection. This Court is not concluding, nor need it do so, that the audio recordings were deliberately withheld or concealed from the defense. The fact of the matter is that many hours of recorded conversations did not become available to defense counsel until shortly before trial. They became available at an interval that was too brief to meaningfully listen to them and evaluate them and determine what, if any significance the statements of Dowthard in those recorded conversations had, as it might relate to the truthfulness of his "eyewitness" testimony.

Judge McGraw found further that while the Dowthard tapes contained long, rambling, disjointed conversations full of street slang, "[t]hey included outright denials of knowledge about the facts of the case, as well as potential coaching to testify a certain way, as well as potential incentive to testify a certain way." Judge McGraw concluded that the court was not sufficiently assured that the outcome of the trial would not have been different had Dowthard been cross-examined concerning his statements on the Dowthard tapes. For this sole reason, the Court found that "due process requires that Petitioners receive a new trial." The State appealed and the Illinois Appellate Court affirmed. People v. Johnson, 2014 IL App (2d) 130368-U.[5]

### D. Plaintiffs' 2015 Bench Retrial

Judge McGraw also presided at plaintiffs' 2015 re-trial without a jury. Brown again provided testimony consistent with both his May 9, 2002 written statement and his prior trial testimony, placing plaintiffs at the scene of the murder. Judge McGraw noted that the State's Attorney had not offered Dowthard immunity for the attempted-first degree murder of Ross, Johnson, and Anderson based on his shooting at them from his Monte Carlo. Without that immunity, Dowthard invoked his

---

[5]While it is unclear why the trial court granted Ross postconviction relief based on the late turn over of the Dowthard tapes because his trial did not commence until February 2004, the Illinois Appellate court affirmed as to Ross on ineffective assistance of counsel grounds based on Kline's failure to impeach Dowthard with the tapes at Ross' trial. See Johnson, 2014 IL App (2d) 130368-U at ¶ 104.

Fifth Amendment privilege against self-incrimination and refused to testify. Because Dowthard was the key eyewitness and refused to testify, Judge McGraw acquitted plaintiffs.

### E. The Instant Cases Pending Before this Court

Johnson and Ross filed their initial complaint in 15 C 50064 on March 17, 2015, and Anderson filed his initial complaint in 15 C 50065 on March 18, 2015. Although the paragraph numbering differs and the verbiage is slightly different in very limited aspects, Johnson's and Ross' first amended complaint and Anderson's second amended complaint are essentially identical and contain the following counts.

Count I contains § 1983 due process claims against all defendants. It is alleged that defendant officers withheld exculpatory evidence, fabricated false statements and police reports, and suborned perjury, thereby depriving plaintiffs of a fair trial and appeal in violation of the Due Process Clause of the Fourteenth Amendment. It is further alleged that defendant officers' misconduct was undertaken pursuant to a policy and practice of the Rockford Police Department to secure false convictions through flawed investigations and maintaining a "code of silence" that eliminated accountability, discipline, or oversight, and provided officers with de facto immunity from departmental discipline or criminal charges.

Count II contains § 1983 failure to intervene claims against all defendants. It is alleged that one or more defendant officers stood by during the constitutional violations without intervening to prevent the misconduct. It is also alleged that these failures to intervene were undertaken pursuant to the policy and practice described in Count I.

Count III contains § 1983 conspiracy claims against all defendants. It is alleged that the defendant officers reached an agreement among themselves to frame plaintiffs for murder and deprive them of their constitutional rights. It is further alleged that this conspiracy was undertaken pursuant to the policy and practice described in Count I.

The operative complaints contain no Counts IV-VI. Count VII contains § 1983 claims for supervisor liability. It is alleged that plaintiffs' constitutional injuries were proximately caused by a pattern and practice of misconduct which occurred with the knowledge and consent of those defendants who acted in a supervisory capacity "including but not limited to Iasparro, Lindmark, and Glover" who knew about, facilitated, and condoned the pattern and practice of misconduct. It is also alleged that the misconduct of these supervisors, was undertaken pursuant to the policy and practice described in Count I.

Count VIII contains § 1983 claims for malicious prosecution.[6] It is alleged that defendant officers maliciously caused plaintiffs to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. It is further alleged that the judicial proceedings were terminated in plaintiffs' favor in a manner indicative of innocence. Counts IX through XII are state-law claims for malicious prosecution, intentional infliction of emotional distress ("IIED"), respondeat superior, and indemnification, respectively.

---

[6]Plaintiffs included this claim to preserve it in the event that the Seventh Circuit overturned its ruling in Newsome v. McCabe, 256 F.3d 747 (7th Cir. 2001).

At his deposition, Stevens testified that he and Palmer interviewed Dowthard at Big Muddy on May 2, 2002, and that he never left the interview room when he, Palmer, and Dowthard were together. After the interview, Stevens learned that the audio recordings of the phone calls Dowthard made and received while at Big Muddy were available, but that the recordings would have to be subpoenaed. Stevens said that an assistant state's attorney had a subpoena issued and personnel at Big Muddy eventually sent him cassette tapes of the recordings in multiple mailings. Once he had all the tapes, Stevens tagged them into evidence on October 11, 2002. Stevens said that he listened to the tapes, but he did not remember when he did so.[7]

During his deposition, Montgomery testified that he did not remember giving a statement on August 27, 2002, and that his signature was not on the purported written statement. Montgomery did say that if the statement indicated that Ross borrowed his red rental car, than it was not true and that he does not remember Ross ever confessing the murder to him. Montgomery testified further that he did not remember Palmer making threats to him during the creation of the August 27, 2002, statement, but he knew that Palmer at some point tried to get him to say that Ross borrowed his car by threatening to charge him with the murder. When asked if Palmer and Stevens made any promises of consideration on August 27, 2002, during the creation of the statement, Montgomery said, "I don't remember the time or the process of the statement." When asked whether it was his testimony that the police fabricated parts of his August 27, 2002 statement, Montgomery said, "I don't remember this statement at all. The whole entire statement." Montgomery acknowledged signing his July 18, 2011 affidavit and said that everything in it was true.

When his deposition was reconvened on a second date, Montgomery began answering questions and in so doing admitted that he had been a member of the Black P. Stones street gang. When Montgomery realized during his deposition that it was the plaintiffs' attorneys' theory that he and Taylor were the real murderers, Montgomery said that he would not have given plaintiffs' attorneys his July 18, 2011 affidavit and he would like to take it back. Montgomery stated further that he did not remember any defendant asking him questions about the murder back in 2002 and, in fact, asserted his Fifth Amendment privilege when asked if he even knew any of the defendants. When asked if the factual statements in his July 18, 2011 affidavit were true, Montgomery responded, "I plead the Fifth." Montgomery also refused on Fifth Amendment grounds to answer any questions regarding whether defendants threatened him, coerced him, or fabricated any of his statements.

During his deposition, Palmer also exercised his Fifth Amendment rights on the advice of counsel when asked numerous questions about his alleged fabrication of false statements and testimony, and about his withholding of exculpatory and impeachment evidence. At his deposition, Dowthard also responded, "I plead the Fifth," to each question posed to him.

---

[7]Plaintiffs cite their Exhibit 36, Stevens' Evidentiary Hearing Testimony, at JR12093, in support of their assertion that Stevens told the prosecutors there was nothing relevant on the tapes but that exhibit ends at JR11706. Nevertheless, the court will assume this is true as it does not change the analysis.

## II. ANALYSIS

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party. Springer v. Durflinger, 518 F.3d 479, 483 (7th Cir. 2008). Summary judgment is mandated, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). For the purposes of a motion for summary judgment, the court must look at the evidence in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 248.

In Count I, plaintiffs advance multiple due process claims based on both fabrication of evidence and withholding evidence. The Due Process Clause of the Fourteenth Amendment guarantees criminal defendants a fair trial. U.S. Const. amend. XIV. Defendants contend that plaintiffs have not identified sufficient evidence of any due process violations. In response, plaintiffs maintain that there is evidence of seven instances where defendants fabricated evidence that they knew to be false and that there are eleven instances of defendants' withholding exculpatory or impeachment evidence.

### A. Due Process Claims Based on Fabrication of Evidence

The Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." Whitlock v. Brueggemann, 682 F.3d 567, 580 (7th Cir. 2012). However, at the outset, it is essential to the analysis to understand what the Seventh Circuit has called the "terminological distinctions" between coerced testimony and fabricated testimony as these terms relate to Fourteenth Amendment due process jurisprudence. "Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false." Fields v. Wharrie, 740 F.3d 1107, 1110 (7th Cir. 2014). In contrast, in a strictly legal context, "[f]abricated testimony is testimony that is made up; it is invariably false." Id.; see also Petty v. City of Chicago, 754 F.3d 416, 422 (7th Cir. 2014) ("[F]abricating evidence that [is known] to be false is different than getting a reluctant witness to say what may be true."). Fabricated testimony is madeup, manufactured, or created by the fabricator and therefore known by him to be false. Petty, 754 F.3d at 422; Whitlock, 682 F.3d at 570-71 (finding evidence fabricated where the prosecutor was a part of an investigative team that told witnesses what to say knowing that the information they gave the witnesses was false). Understanding this distinction is essential because, even though obtaining testimony that inculpates the accused by coercing a witness may violate that witness' rights, it does not violate the accused's due process rights. Petty, 754 F.3d at 422. The Seventh Circuit has explained that:

> coercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful

convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at trial, because evidence collected with these kinds of suspect technique, <u>unlike falsified evidence and perjured testimony</u>, may turn out to be true.

<u>Fields</u>, 740 F.3d at 1112. It is also important to recognize that while coercion "may be an essential tool in 'persuading' a witness to fabricate testimony," <u>id.</u>, coercing true or false testimony from a reluctant witness without knowingly manufacturing the false testimony does not violate the due process rights of the accused, <u>Petty</u>, 754 F.3d at 422. Therefore, in order for their fabrication-of-evidence due process claims to survive summary judgment, plaintiffs will need to identify evidence showing that defendants knew that a witness' statement later presented as testimony was false, not merely evidence that the statement and resulting testimony were coerced. Plaintiffs do not take issue with this analysis as they have stated in their consolidated response to the motions for summary judgment that: "[t]he question at summary judgment as far as Plaintiffs' fabrication claims are concerned is whether there is a genuine dispute over whether Defendants Palmer, Randall, Stevens, Glover, and Mastroianni fabricated evidence they knew to be false and which was used to deprive Plaintiffs' of [their] liberty." Keeping this essential question in mind, the court will address each of the seven purported instances of defendants fabricating evidence. Plaintiffs' claims are that defendants fabricated, <u>i.e.</u> made up, evidence that they knew was false and intended that witnesses would testify to that fabricated evidence.

### 1. Lataurean Brown

Plaintiffs maintain that "[d]efendants Palmer and Stevens threatened Mr. Brown into signing a fabricated statement that falsely implicated Plaintiffs in the murder, and which he later testified to at trial." Plaintiffs argue that at their 2015 retrial, Brown confessed that he only gave the false statement because Palmer threatened to send him to jail. This argument misstates the evidence. Brown has never said that his May 9, 2002 written statement was false, let alone that Palmer or Stevens fabricated the statement knowing it was false. In fact, the evidence in the record only shows that Brown's May 9, 2002 written statement, as well as his subsequent testimony at Johnson and Anderson's 2002 trial, Ross' 2004 trial, and the 2015 retrial, was true. On one of the pages of Brown's 2015 retrial testimony which plaintiffs cite to support their argument, Brown twice reaffirms the truth of his May 9, 2002 written statement:

Q. Did you tell the officers the truth?

A. Yes

Q. Of what you saw?

A. Yes.

MR. GREENBERG: Objection, Judge.

. . . .

THE COURT: The question was, did you tell the officers the truth? Overruled.

A. Yes.

Plaintiffs also point to Palmer's postconviction evidentiary hearing testimony wherein Palmer testified that he "fed" Brown information about the M&M Market because it would corroborate Dowthard's verbal account of events. First, whether Dowthard and Brown visited the M&M Market is a collateral fact that does not go to the core of Brown's testimony, which is that Dowthard shot at plaintiffs before plaintiffs arrived at Dowthard's mother's house and heard four shots as Dowthard was running toward the car while plaintiffs were in the area. Moreover, it is not unusual for an officer to direct a witness to a fact in order to confirm whether his account matches up with another witness' account. Most importantly, there is no evidence that Palmer did not believe that Brown and Dowthard actually went to M&M Market and without evidence that Palmer knew that fact was false, there is no evidence of fabrication. Petty, 754 F.3d at 422.

Plaintiffs also point to Stevens' deposition testimony as evidence of the fabrication of Brown's May 9, 2002 written statement. In particular, plaintiffs claim that Stevens "confessed" that Brown told them the same thing on April 24, 2002, as he did on May 9, 2002. Plaintiffs contend that "[n]otwithstanding Brown's assertion that he did not see and therefore did not know who did the shooting, on May 9, 2002, Brown signed a statement asserting that he saw Plaintiffs driving a red vehicle on Chestnut Street before hearing four gunshots." Plaintiffs conclude that Brown's May 9, 2002 written statement must have been fabricated by Stevens and Palmer. While Stevens repeatedly testified during his deposition that he did not specifically recall what Brown said on April 24, 2002, and unequivocally said that he typed Brown's own words into the May 9, 2002 written statement "as close to [Brown's] words as possible," there are deposition questions and answers that could be interpreted as Stevens stating that he knew what Brown said on April 24, 2002, and what he said on May 9, 2002, was the same:

> Q. Did you have any conversations with Doug Palmer about what Lataurean Brown told him in April of 2002 as it relates to the Demarcus Hanson homicide?

> A. Doug Palmer and I were both in the interview room, so we heard the same thing. Then I remember what he said. Like I said before, the statement is usually a much better detailed account of what the overall verbal account is because you are going step-by-step-by-step because you're memorializing it in a written document.

> While I knew what he said earlier, he didn't deviate from that. And the content was -- the facts were generally the same. They didn't deviate from that. There was no earth-shattering right turn from what he said prior. So I had typed the statement on the 9th, and we went just step by step. So that's how I documented the May 9th interview.

> Q. I see. So you knew what the Lataurean Brown told you and Detective Palmer during the first interview.

> A. I remember the interview. I don't remember specifics. As I sit here today, I don't recall specific content and who said what, when, and that kind of thing.

19

At this stage of the litigation, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Liberty Lobby, Inc., 477 U.S. at 255. Even after doing so, however, plaintiffs' argument fails. Contrary to plaintiffs' contention, Brown did not on April 24, 2002, assert that he did not see who did the shooting. Instead, Brown said nothing at all about a shooting at Dowthard's mother's house. Consequently, when Stevens said that Brown's oral statements on April 24, 2002 and on May 9, 2002 are the same, that does not mean that Brown did not also state on May 9, 2002 that he saw plaintiffs pull up in front of the house and that he heard four gunshots after he drove away from the house because that is not inconsistent with what Brown said on April 24, 2002. In other words, Stevens explained that Brown's April 24, 2002 oral statement was consistent with his May 9, 2002 oral statement, just not as exhaustive. Stevens also explained that the written statement was the best indicator of the complete statement made by a witness because "you are going step-by-step. Therefore, the court concludes that plaintiffs have failed to identify sufficient evidence that Palmer and Stevens fabricated Brown's May 9, 2002 written statement.

As far as coercion producing Brown's May 9, 2002 written statement, Brown testified that Palmer threatened to put him in jail if he did not give a statement, but Palmer testified at the postconviction evidentiary hearing that this "threat" consisted only of his advising Brown that he could be charged with obstructing justice if he did not cooperate and tell the truth. An officer does not improperly coerce a statement from a witness by advising him to tell the truth. See Etherly v. Davis, 619 F.3d 654, 663 (7th Cir. 2010) ("[A police officer] merely telling somebody to tell the truth is not coercive."); see also United States v. June, 312 F. App'x 990, 991 (9th Cir. 2009) ("A police officer's repeated exhortations to tell the truth do not amount to coercion."). In any event, if believed, this is only evidence of coercion and not fabrication and is therefore insufficient. See Petty, 754 F.3d at 422.

Plaintiffs also urge this court to find evidence of fabrication in the form of an adverse factual inference drawn from Palmer invoking his Fifth Amendment privilege when asked the following questions during his deposition in this case:

Q. Sir, isn't it true that on May 9, 2002, yourself and Defendant Stevens coerced Lataurean Brown through a nearly nine-hour interrogation into falsely implicating Lumont Johnson, Tyjuan Anderson, and Anthony Ross in shooting Demarcus Hanson?

. . . .

Q. Sir, isn't it true that this statement by Lataurean Brown is false and was fabricated by yourself and Defendant Stevens on May 9, 2002?

"[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment does not preclude the inference where the privilege is claimed by a party to a Civil cause." Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) (emphasis added); see also Hillmann v. City of Chicago, 834 F.3d 787, 793 (7th Cir. 2016); LaSalle Bank Lake View v. Seguban, 54 F.3d 387, 390 (7th Cir. 1995). Nevertheless, even with regard to a party to the case, the adverse factual inference alone is not enough to meet the non-moving party's summary judgment burden; there must be some other

evidence to corroborate the inference. See Curtis v. M&S Petroleum, Inc., 174 F.3d 661, 675 (5th Cir. 1999) ("[T]he adverse inference from a party's refusal to answer questions was not enough to create an issue of fact to avoid summary judgment."); LaSalle Bank, 54 F.3d at 391 ("[A]lthough inferences based on the assertion of the privilege are permissible, the entry of judgment based only on the invocation of the privilege and without regard to the other evidence exceeds constitutional bounds."); Avirgan v. Hull, 932 F.2d 1572, 1580 (11th Cir. 1991) ("Invocation of the fifth amendment privilege did not give rise to any legally cognizable inferences sufficient to preclude entry of summary judgment. The negative inference, if any, to be drawn from the assertion of the fifth amendment does not substitute for evidence needed to meet the burden of production."); Kluppelberg v. Burge, No. 13 C 03963, 2017 WL 3142757, at *4 (N.D. Ill. July 25, 2017) ("[T]he non-movant must point to some evidence in addition to defendant's silence to avoid summary judgment."); Logan v. City of Chicago, 891 F. Supp. 2d 897, 901 (N.D. Ill. 2012) (stating in a § 1983 wrongful conviction case alleging police misconduct that "a party's refusal to answer questions during discovery is not enough to create an issue of fact to avoid summary judgment."); Barker v. Int'l Union of Operating Eng'rs Local 150, No. 08 C 50015, 2011 WL 6338800, at *6 (N.D. Ill. Dec. 19, 2011) ("[A]n adverse inference based on silence pursuant to the assertion of the Fifth Amendment privilege is insufficient by itself to create an issue of material fact precluding summary judgment."). Consequently, no adverse factual inference can be drawn against Stevens since he was not the one invoking the Fifth Amendment.[8] Moreover, even as to Palmer, the inference is not enough because, as the court has indicated, plaintiffs have not identified other evidence to corroborate the alleged fabrication of Brown's statement.

## 2. Alex Dowthard

Plaintiffs maintain that Palmer, Stevens, Randall, and Glover coerced Dowthard into agreeing to go along with a fabricated statement implicating plaintiffs in the murder which Dowthard later testified to at their trials. Plaintiffs argue that Dowthard only falsely implicated them and provided a fabricated statement as a result of coercion and promises of consideration made to him by Palmer, Stevens, Randall, and Glover. Again, however, plaintiffs have failed to identify any evidence of fabrication, that is, evidence that defendants manufactured Dowthard's May 31, 2002 statement knowing it was false.

In an effort to identify evidence of fabrication, plaintiffs have instead cited evidence which, at best, shows only coercion. In particular, plaintiffs cite to portions of the Dowthard tapes wherein Dowthard told someone named "Maria" that Palmer hit him "upside his head," wherein he told his mother that "they" were talking "about bringing [him] up on some federal charges," and wherein he told Antowan Lambert that he "wasn't no mother fucking where around, you know what I'm saying?" As a threshold matter, plaintiffs have not established how the Dowthard tapes would be admissible at trial in order to be properly considered at the summary judgment stage. See Gunville

---

[8]Plaintiffs have not argued that there is some relationship of loyalty between Palmer and his codefendants that would impute Palmer's Fifth Amendment invocation to another party. See LiButti v. United States, 107 F.3d 110, 122 (2d Cir.1997). Nevertheless, the court would find no such relationship because by the time of his deposition Palmer had resigned from the Rockford Police Department under questionable circumstances and was accusing his codefendants of wrongdoing.

v. Walker, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment."). Clearly, Dowthard's statements on the Dowthard tapes would be hearsay. Fed. R. Evid. 801(c). Hearsay is not admissible. Fed. R. Evid. 802. Plaintiffs have not identified a hearsay exception that would be applicable. Accordingly, that argument is undeveloped and not supported with pertinent authority and is accordingly waived. See Arlin–Golf, LLX v. Vill. of Arlington Heights, 631 F.3d 818, 823 (7th Cir. 2011) (finding plaintiffs' argument waived because they failed to point out any relevant authority on appeal); United States v. Elst, 579 F.3d 740, 743 (7th Cir. 2009) ("Perfunctory and undeveloped arguments as well as arguments unsupported by pertinent authority are waived.").

Putting the waiver aside, no hearsay exception is apparent. The court has on its own accord considered three possibilities. First, the Dowthard tapes will not be admissible as recorded recollections under Rule 803(5). Dowthard will either refuse to testify at trial on Fifth Amendment grounds or he will be barred from testifying at trial because defendants were unable to depose him in this case. See Barker, No. 08 C 50015, 2011 WL 6338800, at *2 (noting that when a witness invokes her Fifth Amendment rights preventing her deposition she is disqualified from testifying at trial); Nat'l Org. for Women, Inc. v. Scheidler, No. 86 C 7888, 1990 WL 103212, at *1 (N.D. Ill. July 18, 1990) (citing authority in support of an order precluding [a witness] from changing his mind at trial and testifying on matters about which he has refused to testify during his deposition on the basis of the Fifth Amendment). Consequently, plaintiffs will be unable to establish that the Dowthard tapes concern a matter about which Dowthard once had knowledge but now has insufficient recollection to testify fully and accurately as Rule 803(5) requires. See Collins v. Kibort, 143 F.3d 331, 338 (7th Cir. 1998) (holding that the trial court erred in admitting diary as a recorded recollection because witness did not state that he could not recall the events about which he used his diary to testify and therefore witness did not lay the proper foundation for the diary's admissibility as a recorded recollection).

Second, the Dowthard tapes cannot come into evidence as Rule 803(6) business records because the content of the recordings was provided by third-parties with no business duty to make and keep the record. While the recording of inmates' telephone conversations may occur in the ordinary course of prison business, that does not mean the content of the recordings is admissible as a business record where, as here, the providers of the content are under no business duty. See Jordan v. Binns, 712 F.3d 1123, 1133 (7th Cir. 2013) ("[T]hird-party statements contained in a police report do not become admissible for their truth by virtue of their presence in a public record and instead must have an independent basis for admissibility.).

Third, the Rule 807 residual exception requires, among other things, "circumstantial guarantees of trustworthiness" equivalent to the Rule 803 and Rule 804 exceptions. It cannot be argued that a conversation durring a prison telephone call between two felon gang members meets this requirement. See United States v. Moore, 824 F.3d 620, 623 (7th Cir. 2016) (noting that a declarant's criminal record is an appropriate factor to consider in assessing trustworthiness). Rule 807 also requires that the hearsay statement be more probative on the point for which it is offered that other available evidence. In this case, up to the point of the conversations constituting the Dowthard tapes, Dowthard had several times claimed that he did not know who was responsible for shooting DeMarcus and had done so in documented statements to the police. Thus, more statements

by Dowthard of that sort on the Dowthard tapes would not be more probative on that point than his previous statements made to the police.

Nevertheless, even if the Dowthard tapes were admissible and the statements thereon believed by a jury, evidence that a witness was coerced to provide a statement without evidence of fabrication is insufficient to sustain plaintiffs' fabrication-of-evidence due process claims. See Petty, 754 F.3d at 422. Moreover, the Dowthard tapes would be cumulative of Dowthard's initial statement to the police in which he denied knowledge of who shot Demarcus and, therefore, would not pass Rule 403 balancing. See Fed. R. Evid. 403 (permitting the exclusion of relevant evidence where its probative value is substantially outweighed by the danger of needlessly presenting cumulative evidence).

Plaintiffs also cite portions of Dowthard's deposition testimony where he asserts his Fifth Amendment privilege when asked whether Palmer coerced his statement implicating plaintiffs in the murder by hitting him, as well as by promises not to charge him with firing a gun or with forgery. But no adverse factual inference can be drawn against defendants with respect to Dowthard's assertion of his Fifth Amendment rights because defendants are not the ones asserting the right. See Baxter, 425 U.S. at 318; Hillman, 834 F.3d at 793; LaSalle Bank , 54 F.3d at 390. Moreover, even if such an adverse factual inference could be drawn against defendants, it would still only amount to evidence of coercion and not fabrication. See Petty, 754 F.3d at 422.

Plaintiffs also attempt to rely on Palmer's deposition testimony wherein he refused to answer questions suggesting that Dowthard's statement was the product of coercion on Fifth Amendment grounds. While an adverse factual inference may be drawn from this against Palmer because he is a party, the inference that might be drawn is by itself insufficient. See LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901. In addition, even if believed this would only amount to evidence of coercion, not of fabrication, and is therefore insufficient. See Petty, 754 F.3d at 422. Consequently, plaintiffs have failed to identify sufficient evidence to support their second instance of purported evidence fabrication.

### 3. Toni Gulley

The third instance of purported fabrication is that Palmer and Randall fabricated Toni Gulley's statement that she may have been incorrect in her approximation of the time that Ross came home, which plaintiffs claim effectively nullified Ross' alibi at trial. In support, plaintiffs cite Gulley's November 28, 2007 affidavit in which she swore that Palmer and Randall threatened to have DCFS take her baby away if she did not say that Ross came home at 6:00 a.m. the morning of the murder, and not around 2:45 a.m. as she had previously indicated. In her affidavit, Gulley states that after being threatened she "may have told the police that [she] could have been off by a little on the time that [Ross] came home." In his postconviction evidentiary hearing testimony, Palmer said that he did threaten Gulley that he would call DCFS if she did not cooperate in an effort to convince Gulley to say that Ross got home sometime after 2:45 a.m. However, during his deposition Palmer refused on Fifth Amendment grounds to answer questions about his interview of Gulley. In contrast, at his deposition, Randall testified that he did not threaten Gulley and never heard Palmer make threats during any interrogation.

Plaintiffs will not be able to prove this purported instance of fabrication through Gulley's trial testimony. In an order entered on January 19, 2017, this court accepted the magistrate judge's report and recommendation that defendants' motion to bar Gulley from testifying at trial be granted because defendants were not afforded the opportunity to depose her. In addition, the court has not been directed to sufficient evidence showing that Palmer knew he was coercing Gulley to tell a falsehood, as opposed to coercing her to tell the truth about when Ross got home on the morning in question. Palmer's refusal on Fifth Amendment grounds to answer a question suggesting that he knowingly attempted to coerce Gulley to state a falsehood will not suffice since there is no other evidence to corroborate any adverse inference. See LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901.

Even if plaintiffs were not precluded from presenting Gulley's testimony at trial, her testimony does not support a fabrication-of-evidence claim because she did not adopt the purported fabrication. At Ross' trial, Gulley testified that Ross came home at 2:45 a.m. on April 14, 2002. She did not testify to a later time as she and Palmer claim Palmer asked her to do. On cross-examination, Gulley denied that she told detectives Cone and Jimenez on April 24, 2002, that she could have been off on the time by as much as a half-hour. Therefore, assuming that Palmer and Randall did attempt to fabricate a different time for Gulley to include in her statement and subsequent trial testimony, an evidence-fabrication claim cannot be sustained on this alleged incident because Gulley did not testify to the fabricated time at Ross' trial. Instead, Gulley was steadfast in her testimony that Ross got home at 2:45 a.m. It must be remembered that Whitlock and Fields stand for the principle that police officers who fabricate evidence against a criminal defendant violate due process only if that evidence is used to deprive the defendant of his liberty in some way. Whitlock, 682 F.3d at 580; Fields, 740 F.3d at 1111-12. When an officer "fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." Whitlock, 682 F.3d at 582. Because Gulley's trial testimony was favorable to Ross, it was not used to deprive him of his liberty.[9] Thus, plaintiffs have failed to identify adequate evidence to support their third fabrication-of-evidence due process claim.

#### 4. Larson's Testimony as to Anderson's Statement

Plaintiffs maintain that Larson and Grindley fabricated a false statement attributed to Anderson which the State characterized at trial as a confession. During his deposition, Larson explained that he assisted in apprehending Anderson on a murder warrant on July 1, 2002. Anderson's brother Terrance Anderson was also arrested. Anderson and Terrance were placed in adjacent holding cells and Larsen and Grindley were posted outside the holding cells. Larson overheard Terrance say to Anderson, "just don't tell them anything." Anderson responded, "it's okay, man, I'll just do the 20 years and be out." Larson wrote down Anderson's statement on his

---

[9]Plaintiffs argue that at Ross' trial, after Gulley denied telling Detectives Cone and Jimenez that she could have been off on the time, the State called Jimenez to impeach Gulley and he testified that Gulley had indeed so stated when he and Detective Cone interviewed her on April 24, 2002. But this is not evidence that a statement fabricated by Palmer and Randall was utilized at trial because Palmer testified that he threatened to report Gulley to DCFS on May 16, 2002, and thereafter. Consequently, any equivocation by Gulley on April 24, 2002, as to the time Ross got home could not have resulted from a threat made by Palmer on or after May 16, 2002.

notepad and also noted that Grindley verified that the statement was exactly what she heard. Larson later wrote a report documenting Anderson's statement and testified to the statement at Anderson and Johnson's 2002 trial. During his deposition, Anderson said he never made the statement.

At summary judgment, the court must construe the facts in favor of the nonmovant and, therefore, the court must assume that Larson contrived Anderson's statement. However, unlike the other six purported incidents of evidence fabrication, this one involves a claim that the officer fabricated his own trial testimony. It is clear that this type of due process claim is not cognizable. See Briscoe v. LaHue, 460 U.S. 325, 326 (1983) (holding that § 1983 does not authorize a convicted person to assert a claim for damages against a police officer for giving perjured testimony at his criminal trial because witnesses are absolutely immune from damages liability based on their testimony); see also Curtis v. Bembenek, 48 F.3d 281, 283-84 (7th Cir. 1995); Elsayed v. Vill. of Schaumburg, No. 14 C 8387, 2015 WL 1433071, at *4 (N.D. Ill. Mar. 26, 2015). This rule protects the truth-seeking function of the judicial system because, "[a] witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence." Briscoe, 460 U.S. at 333-34. Testimonial immunity also protects truthful police officers, and indirectly the public which relies on their performance, because "[s]ubjecting government officials, such as police officers, to damages liability under § 1983 for their testimony might undermine not only their contribution to the judicial process but also the effective performance of their other public duties." Id. at 343. For these reasons, even if plaintiffs could convince a trier of fact that Larson and Grindley fabricated Anderson's inculpatory statement they would be absolutely immune from liability under § 1983 and plaintiffs' fourth evidence-fabrication claim therefore fails.

### 5. Sonya White

Plaintiffs claim that Stevens fabricated portions of White's September 12, 2002, statement in which she said that Ross confessed to the shooting and threw a gun into Levings Lake, all of which she testified to at trial. White, however, has never indicated that her purportedly false statement or subsequent trial testimony was fabricated by Stevens. White did not swear in her October 28, 2007 affidavit that any assertions in her September 12, 2002 statement were manufactured by Stevens, or that Stevens knew that anything in her statement was false. Instead, in her affidavit White swore that: "[t]he only things that are true in my statement are my name and where I was living at the time. I made up everything else." Likewise, White did not testify at the postconviction evidentiary hearing that Stevens or any other defendant fabricated the content of her September 12, 2002 statement knowing that it was false. Instead, White repeatedly testified that she "made up" the facts in her statement.

Based on the following exchange during White's postconviction evidentiary hearing testimony, plaintiffs maintain that White did testify that Stevens provided her with the information contained in her statement:

> Q. So how did you come up with the information that's in your statement?

> A. Well, when the detectives was [sic] questioning me they asked me about it, and I just went off what they were saying.

. . . .

> Q. Did the detectives provide you with information about the murder?

> A. In some sorts that's how I find [sic] out about it.

When asked to explain how the detectives provided her with information about the murder, White said:

> A. They asked me did I know about it and did I know about any of the guys that they questioned me about.

> Q. And what did you tell the police in response?

> A. I told them I just knew Anthony.

White's response, "[i]n some sorts that's how I find [sic] out about it," when asked if the detectives provided her with information about the murder, is too vague to constitute evidence of fabrication. Moreover, White's purportedly fabricated statement was not about the murder itself but, rather, what occurred after the murder. This testimony establishes only that the detectives asked White if she knew about the murder and whether she knew the plaintiffs. It hardly amounts to evidence that the detectives provided the facts that White put into her statement, or that the detectives knew those facts were false. Moreover, White claimed no less than fifteen times during her postconviction evidentiary hearing testimony that <u>she</u> made up the account in her September 12, 2002 statement as well as the account she gave during her testimony at Ross' 2004 trial.

Plaintiffs maintain further that White swore in her October 28, 2007 affidavit that she provided false information against Ross because Stevens promised to help her on her pending home invasion case. But White admitted under cross-examination at the postconviction evidentiary hearing that she did not get any consideration on her home invasion charge in exchange for her testimony against Ross. In fact, White admitted that by the time she testified against Ross in 2004 she had already pleaded guilty to attempted home invasion and, in exchange, had agreed to testify against her co-defendants in that case, breached that agreement, and was in custody awaiting sentencing. In any event, evidence of promises made to or consideration given to White are evidence of coercion and not evidence that her statement was fabricated.

Plaintiffs also cite portions of Palmer's deposition in which he exercised his Fifth Amendment rights when asked whether he fed White false information in order to obtain a false statement from her implicating Ross. The adverse factual inference that could be drawn from Palmer invoking his Fifth Amendment rights could only be drawn against Palmer, not Stevens. <u>See Steco, Inc. v. S & T Mfg., Inc.</u>, 745 F. Supp. 305, 309 (E.D. Pa. 1990) (citing <u>Palmigiano</u> and noting that adverse inferences from the assertion of the fifth amendment privilege are allowed in civil cases only against the party who invoked the privilege and no adverse inference can be drawn against one defendant because another defendant refused to answer questions). Moreover, it is clear that such an adverse factual inference is by itself insufficient to create a genuine issue of material fact as to whether Palmer fabricated White's statement. <u>See LaSalle Bank</u>, 54 F.3d at 391; <u>Logan</u>, 891 F. Supp. 2d at 901. Thus, plaintiffs have failed to identify sufficient evidence of fabrication with respect to their fifth claim.

### 6. Casel Montgomery

Plaintiffs contend that according to the depositions of Stevens, Randall, and Palmer they instructed Montgomery to falsely state in his August 27, 2002 statement that Ross "chirped" Montgomery in the early morning hours of April 14, 2002, borrowed Montgomery's red rental car, and that Ross later confessed to Montgomery that he committed the murder and requested that Montgomery return the red rental car as soon as possible. It is significant that Montgomery did not testify at any of plaintiffs' trials and therefore his August 27, 2002 written statement, which plaintiffs claim was fabricated, did not lead to any trial testimony causing their convictions and resulting deprivation of liberty. This is because police officers who fabricate evidence against a criminal defendant violate due process only if that evidence is used to deprive the defendant of his liberty in some way. Whitlock, 682 F.3d at 580; Fields, 740 F.3d at 1111-12. Nevertheless, plaintiffs argue that their due process rights were still violated as a result of Montgomery's fabricated statement because it deprived them of the opportunity to call Montgomery at trial as a defense witness to testify that he, and not plaintiffs, was in possession of the red rental car at the time of the murder. Plaintiffs contend that they were prevented from calling Montgomery because doing so would have enabled the State to introduce Montgomery's August 27, 2002 statement claiming plaintiffs were in possession of the red car at the time of the murder and that Ross later confessed to the murder.[10]

Despite this argument, it is clear that Montgomery's purportedly fabricated statement did not prevent plaintiffs from calling him at trial. If the facts were as plaintiffs maintain and they interviewed Montgomery before trial and asked him about the veracity of his August 27, 2002 written statement, they would have learned that it was fabricated and could have called Montgomery at trial to expose that fabrication. After all, determining truth or falsity of witnesses' testimony is one of the primary purposes of criminal trials. See Portuondo v. Agard, 529 U.S. 61, 62 (2000) (referring to the trial's truth-seeking function). In support of their argument that Montgomery's August 27, 2002, fabricated statement resulted in a violation of their due process rights even though he did not testify at trial, plaintiffs cite Saunders-El v. Rohde, 778 F.3d 556, 560-61 (7th Cir. 2015); Alexander v. McKinney, 692 F.3d 553, 557 (7th Cir. 2012); and Patrick v. City of Chicago., 213 F. Supp. 3d 1033, 1048 (N.D. Ill. 2016). However, these cases do not stand for the principle that due process is violated because a fabricated statement prevents the defendant from calling that witness. Instead, these cases stand for the principle that a due process claim based on fabrication of evidence, although most commonly based on the presentation of the fabricated evidence at trial which results in a wrongful conviction followed by incarceration, can also be based on the use of fabricated evidence to secure an arrest or indictment which leads to pre-trial incarceration. See Saunders-El, 778 F.3d at 561(holding that "Saunders–El, released on bond following his arrest and acquitted at

_____

[10]Plaintiffs also claim that during an April 26, 2002 interview, Randall fabricated a number of statements that he attributed to Montgomery; in particular, that Montgomery said: he saw Ross go into Timothy Robinson's home and retrieve a pistol prior to the murder; that Ross drove off in a Cadillac with the pistol while Johnson and Anderson followed in the Suburban; and that Johnson later told him "we handled that last night." Plaintiffs do not contend that any of this evidence was presented to either of their juries and, therefore, it is not clear how a fabrication of evidence claim could be sustained on this evidence. See Whitlock, 682 F.3d at 582. To the extent that plaintiffs are advancing the argument that these fabricated statements also kept them from calling Montgomery at trial, the argument fails for the same reason it failed in connection with to plaintiffs' arguments in Sections II.A.6 & 7 of this order.

trial . . .cannot make out an evidence fabrication-based due process violation."); Alexander, 692 F.3d at 557 (same); Patrick, 213 F. Supp. 3d at 1048 ("[W]hat matters for a due-process fabrication claim is simply whether fabricated evidence caused a plaintiff to be wrongfully confined ("in some way").").  In this case, plaintiffs were arrested on June 30, 2002, and July 1, 2002.  Montgomery's statement was obtained on August 27, 2002.  Consequently, Montgomery's statement was not used to secure plaintiffs' arrests.  Nor did Montgomery testify before the grand jury and his August 27, 2002 statement could not have been presented to the grand jury by any other witness because the indictments returned against plaintiffs were filed on July 24, 2002.  Thus, plaintiffs were not prevented from calling Montgomery as a witness at trial and no such impediment resulted in a deprivation of their liberty.

Even if plaintiffs had shown, and they have not, that Montgomery's August 27, 2002 written statement somehow led to their being deprived of liberty, for the reasons that follow, the court concludes that plaintiffs have failed to identify admissible evidence showing that Stevens, Randall, and Palmer fabricated Montgomery's statement.  When last questioned during his deposition on April 7, 2017, about the circumstances leading to his August 27, 2002 written statement and on how his July 18, 2011 affidavit came about, Montgomery repeatedly refused to answer on Fifth Amendment grounds.  Specifically, Montgomery refused to answer on Fifth Amendment grounds when asked whether any of his August 27, 2002 written statement was fabricated by Palmer. Because Montgomery refused to be deposed on these issues on Fifth Amendment grounds, he cannot testify about these issues at trial.  See Barker, No. 08 C 50015, 2011 WL 6338800, at *2 (noting that when a witness invokes her Fifth Amendment rights preventing her deposition she is disqualified from testifying at trial); Scheidler, 1990 WL 103212, at *1(citing authority in support of an order precluding [a witness] from changing his mind at trial and testifying on matters about which he has refused to testify during his deposition on the basis of the Fifth Amendment).  Plaintiffs have not informed the court how any prior statements, affidavits, or testimony by Montgomery would be admissible at trial such that it can be relied upon now in the summary judgment analysis.  "[A] court may consider only admissible evidence in assessing a motion for summary judgment." Gunville, 583 F.3d at 985.  Accordingly, that argument, which is undeveloped and not supported with pertinent authority, is waived.  See Arlin–Golf, LLX, 631 F.3d at 823; Elst, 579 F.3d at 743.

Putting the waiver aside, no hearsay exception is apparent.  In contrast to Palmer's prior testimony, for example, which might be admitted as an opposing party's statement under Rule 801(d)(2), Montgomery's prior testimony and statements are inadmissible hearsay.  See Fed. R. Evid. 801(c) & 802.

The court has considered on its own accord whether Montgomery's prior testimony and statements could be admitted as prior inconsistent statements under Federal Rule of Evidence 801(d)(1)(A).  Under that Rule, a prior statement of a witness who testifies at trial and is subject to cross-examination about the prior statement is not hearsay if the statement is inconsistent with the declarant's testimony. Fed. R. Evid. 801(d)(1)(A). However, the requirements of Rule 801(d)(1)(A) would not be met at trial with respect to Montgomery's prior testimony.  By invoking his Fifth Amendment privilege in response to questions about his prior statements, Montgomery will not be properly subjected to cross-examination regarding those prior statements.  See United States v. Owens, 484 U.S. 554, 562 (1988).  ("[A]ssertions of privilege by the witness may undermine the

process to such a degree that meaningful cross-examination within the intent of the Rule no longer exists."); United States v. Torrez-Ortega, 184 F.3d 1128, 1132 (10th Cir. 1999) (holding that witness was not subject to cross-examination for purposes of Rule 801(d)(1)(A) where the witness asserted Fifth Amendment privilege).  The court has also considered the three hearsay exceptions discussed with regard to the Dowthard tapes.  Because Montgomery refused to answer questions during his deposition he will not be able to testify at trial and, consequently, plaintiffs' would be unable to establish the Rule 803(5) recorded recollection foundation requirement that he lacks recollection. No one would take the position that deposition testimony could qualify as a business record and a prior written statement from a third party, even if documented in a police report, does not qualify as a business record.  See Jordan, 712 F.3d at 1133.  Plaintiffs would also be unable to admit Montgomery's prior statements under the Rule 807 residual exception because Montgomery's prior statements do not have "circumstantial guarantees of trustworthiness" as he is also a felon and a gang member who has given inconsistent accounts during the course of this case.  Thus, plaintiffs have failed to establish how any of Montgomery's prior statements, affidavits, or deposition testimony create a genuine issue of material fact on this fabrication-of-evidence due process claim.

Plaintiffs also claim that Randall's deposition testimony establishes that Stevens told Montgomery to say that plaintiffs were in his red rental car at the time of the shooting.  This is a mischaracterization of the record.  During his deposition, Randall agreed that he was present when Stevens told Montgomery that he, Stevens, and Randall knew that plaintiffs were in his car at the time of the shooting.  Randall did not agree that Stevens told Montgomery what to say.

Plaintiffs are left only with Palmer's refusal on Fifth Amendment grounds to answer questions at his deposition about his procurement of Montgomery's August 27, 2002 statement. However, this evidence could only be used against Palmer, not Stevens and Randall, see Baxter, 425 U.S. at 318; Hillman, 834 F.3d at 793, and for Palmer there would have to be other evidence to support the inference in order to withstand summary judgment, see LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901.  As such, there has been an inadequate showing by plaintiffs of admissible evidence that Montgomery's August 27, 2002 written statement was fabricated.  For all these reasons, plaintiffs' sixth fabrication of evidence claim fails.

### 7. Bryce Croft

Seventh, plaintiffs maintain that Palmer and Mastroianni fabricated a statement for Croft to sign which falsely recanted the information he previously provided to Palmer about Taylor and Montgomery's potential involvement in the murder.[11]  This misconduct, according to plaintiffs, was carried out at the direction of their supervisors, Lindmark and Iasparro.[12]  Like Montgomery, Croft

---

[11]In their response brief, plaintiffs maintain that "defendants" fabricated a statement for Croft to sign. During his postconviction evidentiary hearing testimony, Palmer said that he was alone when he took the statement from Croft while Mastroianni testified at his deposition that he was present when Palmer took Croft's statement.  However, this factual discrepancy does not alter the court's analysis.

[12]The court notes that at the postconviction evidentiary hearing, Palmer claimed that Lindmark told him to make a liar out of Croft, but Palmer did not mention Iasparro.  The only evidence of Iasparro's involvement is Palmer's deposition testimony wherein he asserts his Fifth Amendment rights in response to a question suggesting Iasparro's involvement.  However, the negative factual inference that could be drawn from this could not be used against Iasparro,

did not testify on behalf of the State or plaintiffs at any of plaintiffs' trials and his purportedly fabricated statement was not used to deprive plaintiffs of their liberty. Plaintiffs advance the same argument that they did with respect to Montgomery, that the fabricated statement prevented them from calling Croft as a defense witness at their trials. This argument is rejected for essentially the same reasons stated above with regard to Montgomery. In particular, the case law cited by plaintiffs does not support their argument. Furthermore, plaintiffs were not prevented from calling Croft as a witness at their trials because, if the facts are as they claim, they should have subpoenaed Croft and allowed the truth-seeking function of the trial determine which of Croft's statements were the truth. See Agard, 529 U.S. at 62. Croft's purportedly fabricated October 16, 2002 statement was not used to secure plaintiffs' arrests or indictments. Consequently, because Croft's statement was not utilized to effectuate the deprivation of plaintiffs' liberty, it cannot form the basis of a fabrication-of-evidence due process claim, see Whitlock, 682 F.3d at 580; Fields, 740 F.3d at 1111-12, and plaintiffs' seventh claim therefore fails.

For all the foregoing reasons, the court finds that either plaintiffs have failed to identify sufficient evidence to support all seven of their fabrication-of-evidence due process claims, and as a result no reasonable jury could return a verdict for plaintiffs; or the claims otherwise fail as a matter of law.

## B. Due Process Claims Based on Withholding Evidence

To succeed on a civil § 1983 claim against a police officer for violating Brady v. Maryland, 373 U.S. 83 (1963), a plaintiff must establish that: "(1) the evidence is favorable to him; (2) the evidence was concealed by the officer; and (3) the concealed evidence resulted in prejudice." Cairel v. Alderden, 821 F.3d 823, 832 (7th Cir. 2016). Evidence is favorable to the accused if it is either exculpatory or impeaching. Harris v. Kuba, 486 F.3d 1010, 1014 (7th Cir. 2007). If evidence is turned over to the prosecutors, it has not been concealed by the officer. Cairel, 821 F.3d at 832. "A Brady violation further requires materiality of the evidence withheld, which in the Brady context is the same thing as prejudice." Harris, 486 F.3d at 1014. "Prejudice exists if there is a reasonable probability that the suppressed evidence would have produced a different verdict." Id.

### 1. Lataurean Brown

Plaintiffs maintain that Palmer and Stevens hid the measures they used to induce Brown to falsely implicate plaintiffs in his May 9, 2002 written statement. Plaintiffs assert that at their 2015 retrial, Brown confessed that he only gave the statement because Palmer threatened to send him to jail:

> Q. When you gave your typed statement to officers, did anyone threaten you to make that statement?
>
> A. Well, the police officer Palmer, you know, he -- he was threatening me, put me in jail, you know what I'm sayin'?
>
> Q. For what?

---

see Baxter, 425 U.S. at 318; Hillman, 834 F.3d at 793, and, in any event, at summary judgment would not be sufficient by itself to establish Iasparro's involvement, see LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901.

A. For if I want to make a statement.

Q. And so -- but when you made that statement to the officers, was that based upon what you saw and what you remember at the time?

A. Yeah, at the time.

Q. Did you tell the officers the truth?

A. Yes.

Q. Of what you saw?

A. Yes.

In contrast, Palmer testified at the postconviction evidentiary hearing that this "threat" consisted only of his advising Brown that he could be charged with obstructing justice if he did not cooperate and tell the truth. An officer does not coerce a statement from a witness by advising him to tell the truth. Etherly, 619 F.3d at 663; June, 312 F. App'x at 991. However, at this stage of the litigation, the court must view the facts in a light most favorable to the non-movants and assume that Brown's May 9, 2002 written statement was the product of Palmer's threat that if Brown did not give a written statement he would be put in jail. Nevertheless, plaintiffs suffered no resulting prejudice because Brown made clear during his 2015 retrial testimony that he told the truth despite the threat. In other words, had Brown been asked at plaintiffs' 2002 and 2004 trials: "Is it true that you only gave a written statement because Palmer threatened to put you in jail?," Brown would have answered yes, but that his written statement was still the truth. Therefore, there is no reasonable probability that impeaching Brown's trial testimony with this purportedly withheld evidence would have produced different verdicts. See Harris, 486 F.3d at 1014. Significantly, Brown has never claimed that his May 9, 2002 written statement implicating plaintiffs in the murder was false, and he has always testified consistently with that statement. Consequently, plaintiffs have failed to identify adequate evidence to satisfy the prejudice element of this Brady claim based on a failure to disclose that Palmer coerced Brown's written statement.

Plaintiffs also contend that defendants withheld the fact that Palmer fabricated the content of Brown's May 9, 2002 written statement. As explained in section II.A.1 of this order, according to Palmer's postconviction evidentiary hearing testimony, this "fabrication" involved Palmer feeding Brown the minor detail that Brown and Dowthard went to M&M Market on the morning in question prior to the shootings. Plaintiffs have failed to identify any evidence showing that Palmer thought the M&M Market detail was false and, consequently, there is no evidence of fabrication of Brown's May 9, 2002 written statement that should have been disclosed. Neither does Palmer's refusal to answer on Fifth Amendment grounds when asked if he had fabricated his statement constitute sufficient evidence of a Brady violation because this evidence alone does not create a genuine issue of material fact for summary judgment purposes. See LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901. Because there is insufficient evidence that Brown's written statement was fabricated, there is insufficient evidence of a failure to disclose that fabrication. Therefore, plaintiffs have failed to identify evidence to support their first Brady claim.

### 2. Antowan Lambert

Plaintiffs claim that Palmer and Stevens withheld their conversations with Dowthard's friend and confidante, Antowon Lambert, regarding Lambert convincing Dowthard to change his original story and implicate plaintiffs in the murder. In support of this claim, plaintiffs cite Stevens' deposition testimony. Stevens, however, only stated that he interviewed Lambert and told him that, if he were to speak to Dowthard, he hoped that Lambert would encourage Dowthard "to cooperate, to tell the truth," because Stevens did not believe Dowthard's initial account that Dowthard did not know the identity of the shooters. Plaintiffs have not explained how this conversation constitutes exculpatory or impeachment evidence. It would be exculpatory if Stevens told Lambert to encourage Dowthard to falsely claim that plaintiffs were the murderers, but that is not what Stevens said during his deposition. Nor would Stevens' conversations with Lambert be useful impeachment evidence because Lambert did not testify at any of plaintiffs' trials. Therefore, plaintiffs have not satisfied the favorable evidence element of a civil <u>Brady</u> claim.

Plaintiffs also cite Palmer's deposition testimony wherein Palmer refused to answer questions accusing him and Stevens of promising Dowthard through Lambert that Dowthard would be released from prison and not face any charges as long as Dowthard implicated plaintiffs in the murder, and telling Lambert that he would be free to sell drugs in Rockford as long as he assisted them in obtaining a statement from Dowthard that implicated plaintiffs in the murder. However, the adverse factual inferences that could be drawn from Palmer's refusal to answer such questions could only be used against Palmer, not Stevens, <u>see</u> <u>Baxter</u>, 425 U.S. at 318; <u>Hillman</u>, 834 F.3d at 793, and even as to Palmer there has to be other evidence in order to withstand summary judgment, <u>see</u> <u>LaSalle Bank</u>, 54 F.3d at 391; <u>Logan</u>, 891 F. Supp. 2d at 901. Plaintiffs have not identified other evidence that these purported promises were made to Dowthard through Lambert or even to Lambert himself. Significantly, Palmer did not admit to this conduct during his testimony at the postconviction evidentiary hearing. For these reasons, plaintiffs have failed to demonstrate adequate evidence to support a <u>Brady</u> claim against Palmer and Stevens with respect to their conversations with Lambert.

### 3. The Dowthard Tapes

Plaintiffs argue that Stevens withheld from Johnson and Anderson the exculpatory and impeachment evidence contained on the Dowthard tapes. Plaintiffs maintain that Stevens listened to the tapes and that instead of timely disclosing the tapes, he informed Palmer that he was going to bury the information in order to frame plaintiffs by informing prosecutors that the tapes contained no relevant information. Assuming that Stevens listened to the Dowthard tapes and told the prosecutors that there was nothing relevant on the recordings, there is insufficient evidence to support the assertion that Stevens truly believed that there was exculpatory or impeachment evidence on the Dowthard tapes and told Palmer that he was going to bury the information in order to frame plaintiffs. The only source of evidence that Stevens said he was going to bury the tapes to frame plaintiffs is Palmer's refusal to answer on Fifth Amendment grounds when asked whether Stevens made that statement. The adverse factual inference that could be drawn from this could not be used against Stevens. <u>See</u> <u>Baxter</u>, 425 U.S. at 318; <u>Hillman</u>, 834 F.3d at 793.

Furthermore, even if the inference could be used against Stevens and was by itself sufficient, which it is not, this <u>Brady</u> claim still fails because plaintiffs have failed to identify evidence that the tapes were "concealed by the officer," an essential element of any <u>Brady</u> claim. <u>See</u> <u>Cairel</u>, 821 F.3d

at 832. The Dowthard tapes were subpoenaed from the Illinois Department of Corrections by someone at the State's Attorney's Office and, therefore, it is not clear how Stevens would have concealed the tapes. That Stevens listened to them and concluded that there was no relevant information on the tapes is inconsequential. It is undisputed that the tapes were in the hands of the prosecution by October 17, 2002. Evidence turned over to the prosecution has not been concealed by the officer. Cairel, 821 F.3d at 832. On October 21, 2002, the day trial was scheduled to begin, Johnson and Anderson both moved to continue the trial because they did not have enough time to listen to all the tapes. As a result, Judge Grubb gave them an additional week to do so. Under these circumstances, any resulting prejudice due to a lack of time to listen to the tapes and use them at trial for impeachment of Dowthard or otherwise was not caused by Stevens. Any unfairness with regard to the amount of time the defense was afforded to listen to the tapes was the result of Judge Grubb's limited continuance of the trial, not the late disclosure by the prosecution, and certainly not because of any concealment of the evidence by Stevens.

It is important to recognize that when Judge McGraw, in ruling on the postconviction petitions, found a Brady violation with regard to the late turnover of the Dowthard tapes he was not concerned about who was responsible, only that it resulted in unfairness. In contrast, in this § 1983 civil rights action, this court has to determine if there is sufficient evidence to support a Brady claim against Stevens; there is not. As with all constitutional torts brought under § 1983, plaintiffs must demonstrate personal involvement of a particular defendant in order to recover against that defendant. See Colbert v. City of Chicago, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation."); Marshall v. Buckley, 696 F. Supp. 2d 964, 969 (N.D. Ill. 2010) (granting summary judgment to defendant officers on Brady claim because plaintiff did not put forth evidence to show that they were personally involved in the suppression of evidence). For all these reasons, plaintiffs' civil Brady claim against Stevens for withholding the Dowthard tapes is not supported by sufficient evidence.

### 4. Alex Dowthard

Plaintiffs claim that Glover, Palmer, Stevens, and Randall withheld the coercion and promises made to Dowthard to induce him to give a false statement implicating plaintiffs in the murder. Plaintiffs attempt to support this claim with Dowthard's statements on the Dowthard tapes and with Dowthard's deposition transcripts. However, plaintiffs had the Dowthard tapes before their trials started so no defendant in this case concealed them from plaintiffs. In addition, as explained in section II.A.2 of this order, plaintiffs have not shown how Dowthard's statements on the Dowthard tapes will be admissible at trial. See Gunville, 583 F.3d at 985; Fed. R. Evid. 802. Nor does Dowthard's deposition testimony support this Brady claim because exercising his Fifth Amendment privilege throughout his deposition does not create a situation where any adverse factual inference can be drawn against a party. See Baxter, 425 U.S. at 318; Hillman, 834 F.3d at 793. Moreover, even if the inference could be drawn it does not by itself create a genuine issue of material fact for summary judgment purposes. See LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901. Therefore, plaintiffs have failed to identify evidence to adequately support their fourth Brady claim.

### 5. Toni Gulley

Ross maintains that, according to Palmer, he and Randall withheld the fact that they threatened Toni Gulley by indicating that if she did not cooperate and say that Ross came home later than 2:45 a.m. on the morning of the murder they would contact DCFS and have her baby taken away. However, as explained in section II.A.3 of this order, Gulley did not succumb to this purported threat. Consequently, assuming as the court must at this stage that the threat was made, the failure to inform the defense does not satisfy the prejudice element of a civil Brady claim against a police officer because the withholding was immaterial and, consequently, not prejudicial. In other words, there would be no reason to impeach Gulley's testimony during Ross' trial because it was favorable to him and therefore there is no reasonable probability that asking her about the concealed threat "would have produced a different verdict." Harris, 486 F.3d at 1014. Thus, plaintiffs have failed to present adequate evidence to support a Brady claim against Palmer and Randall with respect to their failure to disclose that Gulley was threatened.

### 6. Rickedda Young

Plaintiffs claim that on April 24, 2002, Rickedda Young told Stevens and Mastroianni that shortly after Demarcus was shot Dowthard and Brown told her that some people were shooting at them when they left Dowthard's mother's house but Dowthard and Brown did not know who the shooters were. According to plaintiffs, despite its importance, Stevens and Mastroianni wrote a police report that omitted this information. This claim is based on Young's testimony at the postconviction evidentiary hearing that on April 14, 2002, she saw her cousin Brown and Dowthard at Concord Commons. According to Young, "[Brown] just said some niggers were shooting at him but he didn't know who it was," and Dowthard said the same thing. When asked if Dowthard told her where he was when he was shot at, Young said "[t]hey said it was coming from his mother['s] house." Young further testified that either the next day or about a week later, Young spoke to two police officers and told them what Brown and Dowthard had said.

Stevens' police report signed May 9, 2002, does reflect that he and Mastroianni spoke to Young on April 24, 2002, but does not include the statement Young claims that she made to them about Brown and Dowthard not knowing who shot at them. Thus, if believed, this constitutes sufficient evidence that Stevens and Mastroianni withheld evidence that could have been used by the defense to impeach Brown and Dowthard's trial testimony that it was plaintiffs who came to Dowthard's mother's house.

However, the withholding of Young's statement did not result in the type of prejudice Brady requires because it merely echoed the fact that Dowthard and Brown had initially indicated that they did not know who shot into Dowthard's mother's house. The Supreme Court has instructed on the prejudice element of a Brady claim:

> [T]he term "Brady violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "Brady material"—although strictly speaking, there is never a real "Brady violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

<u>Strickler v. Greene</u>, 527 U.S. 263, 281 (1999). "[T]he question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Id.</u> at 289. A "reasonable probability" of a different result is shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." <u>Bagley</u>, 473 U.S. at 678. In the instant case, both juries at plaintiffs' criminal trials heard evidence that Dowthard and Brown indicated multiple times during their initial interviews with the police that they did not know who shot into Dowthard's mother's house; Dowthard on April 14, 2002 and again on April 24, 2002, and Brown on April 24, 2002. The juries also heard that this did not change until Brown gave his written statement to the police on May 9, 2002, and Dowthard gave his written statement to the police on May 31, 2002. At both trials, Dowthard's and Brown's testimony implicated plaintiffs and they each acknowledged their initial statements which did not, but that they both explained were untrue. Thus, it was firmly established and undisputed at the trials that Dowthard and Brown had given oral statements in April that were inconsistent with their May written statements as well as with their trial testimony. Had Stevens and Mastroianni revealed to the defendants prior to their trials that on April 24, 2002, Young also reported that Dowthard and Brown made the same initial statements to her, that evidence would have been merely cumulative of what the jury already knew and of what was undisputed at plaintiffs' trials. The Seventh Circuit has made clear that withheld evidence that is "merely cumulative," because it impeaches an already impeached witness, cannot give rise to a <u>Brady</u> violation because there is no reasonable probability that the cumulative evidence would have changed the outcome of the trial. <u>Socha v. Richardson</u>, 874 F.3d 983, 989 (7th Cir. 2017); <u>United States v. Ervin</u>, 540 F.3d 623, 632 (7th Cir. 2008); <u>United States v. Bailey</u>, 510 F.3d 726, 737 (7th Cir. 2007); <u>United States v. Wilson</u>, 237 F.3d 827, 832-33 (7th Cir. 2001); <u>United States v. Kozinski</u>, 16 F.3d 795, 819 (7th Cir. 1994); <u>United States v. Dweck</u>, 913 F.2d 365, 370-72 (7th Cir. 1990). Similarly, in this case, plaintiffs have not given the court a reason to think that the jurors in their criminal trials would have disregarded Dowthard's and Brown's trial testimony implicating plaintiffs in the shooting just because one more person testified that in April 2002 Dowthard and Brown denied knowing who shot at the house. Therefore, plaintiffs' sixth <u>Brady</u> claim fails on the third element required of <u>Brady</u> claims, namely, a reasonable probability that the suppressed evidence would have produced different verdicts. <u>See</u> <u>Cairel</u>, 821 F.3d at 832.

### 7. Sonya White

Plaintiffs contend that Stevens withheld the fact that White's statement given on September 12, 2002, was the product of a promise to help with her pending home invasion case. "[E]vidence that a witness who testified for the Government was the beneficiary of an understanding or agreement as to a future prosecution is relevant to that witness' credibility and . . . in some circumstances, the suppression of such information will violate an accused's right to due process." <u>United States v. Price</u>, 418 F.3d 771, 785 (7th Cir. 2005). But in this case, the record makes clear that by 2004, when White testified at Ross' trial, she knew that she was no longer the beneficiary of any agreement because she acknowledged during her postconviction evidentiary hearing testimony that, at that time, she had already breached her cooperation agreement with the State with respect to her pending attempted home invasion case. White entered into that cooperation agreement with the State on March 24, 2003, long after any "if you can help us we can help you" promise was made by Stevens on September 12, 2002. As such, White knew on March 24, 2003, that she had received

from the State all the consideration on her attempted home invasion case that she was going to receive and that any promise that may have been made by Stevens on September 12, 2002, was irrelevant. For these reasons, the purported promise Stevens made to White was not favorable impeachment material and, consequently, not Brady material.

Additionally, there is no evidence of resulting prejudice from this purported Brady violation because at the time White testified at Ross' trial in 2004, she knew that she would not receive any consideration in her attempted home invasion case as a result of her testimony, yet her testimony remained consistent with her September 12, 2002 statement that was purportedly the result of a promise made by Stevens. In other words, impeaching her about the vague promise Stevens made to her would not have been effective because her testimony at Ross' trial was the same even after she knew no consideration was forthcoming. Thus, there is inadequate evidence of a reasonable probability that the outcome of Ross' trial would have been different had Stevens disclosed his "if you can help us we can help you" statement. Thus, there is insufficient evidence to support plaintiffs' seventh Brady claim.

### 8. Bryce Croft

Plaintiffs maintain that there is evidence to support their claim that Palmer and Mastroianni withheld that they coerced Croft on October 16, 2002, into retracting his prior statement implicating Montgomery and Taylor in the murder by fabricating a statement under the direction of their supervisors Iasparro and Lindmark. At the postconviction evidentiary hearing, Croft testified that Palmer made him sign his October 16, 2002 statement retracting his true statement which implicated Montgomery and Taylor under threat of perjury charges. Palmer testified at the same hearing that he alone fabricated Croft's second statement after being directed by Lindmark to "make a liar out of Croft," but Palmer did not claim that he threatened Croft. However, during his deposition, Palmer refused on Fifth Amendment grounds to answer questions suggesting that he threatened Croft. Mastroianni agreed at his deposition that he was present for Croft's October 16, 2002 statement but specifically testified that Palmer did not threaten Croft. Nevertheless, Croft's evidentiary hearing testimony and the adverse inference drawn from Palmer's Fifth Amendment invocation may constitute evidence of fabrication of Croft's second statement and evidence of a threat made to coerce the statement. It is also undisputed that this fabrication and threat were never disclosed to the defense before plaintiffs' trials.

Even so, this concealed evidence has to be material, and its concealment consequently result in prejudice, before it constitutes a Brady violation. See Cairel, 821 F.3d at 832. Plaintiffs have not explained why their lack of knowledge that Croft's second statement, which retracts his first statement implicating Montgomery and Taylor in the murder, was coerced and fabricated prejudiced them at trial. Croft was not called by either side at any of plaintiffs' trials. Plaintiffs have argued that the second statement kept them from calling Croft as a witness at trial, but the court has already rejected that argument with regard to Montgomery and Croft in sections II.A.6 & 7 of this order as logically flawed and not supported by authority. At the time of plaintiffs' trials, Croft had given two written statements, one tending to implicate Montgomery and Taylor in the murders and one retracting that statement. Either side could have called Croft and allowed the adversarial trial process to flesh out the truth. Thus, the concealment of the coercion and fabrication of Croft's second statement did not prevent plaintiffs from calling him as a witness at their trials. Having heard

no other argument that there is a reasonable probability that the outcome of the trials would have been different had plaintiffs known Croft's second statement was coerced and fabricated, this element of a <u>Brady</u> claim is lacking and plaintiffs' eighth claim fails.

### 9. Police Reports Referencing Montgomery

Plaintiffs claim that Regez, Palmer, Randall, Stevens, and Mastroianni withheld three police reports that implicated Montgomery and were therefore exculpatory with respect to plaintiffs: (1) a December 5, 2002 police report documenting Montgomery saying "what can I do to help myself out of this?" and "you got me, I know I am going to prison and I just want to help myself;" (2) a September 23, 2002 police report indicating that Montgomery was using the nickname "D.J. Hanson;" and (3) a police report from 1999 documenting a report of Montgomery shooting through the window of a house in retaliation for the murder of a relative.

The first police report documents a December 5, 2002 conversation with Montgomery about a drug charge, not Demarcus' murder. When Montgomery said "you got me," and "what can I do to get out of this," he was referring to the drug charge, not Demarcus' murder. Plaintiffs have not explained why they think this is exculpatory <u>Brady</u> material.

The second police report documents a September 23, 2003 report of a person with a stolen cellular phone at a US Cellular store which turned out to be Montgomery. A customer service representative told police that the person used the name "D.J. Hanson." The police arrived and discovered the person was Montgomery who said, among other things, that he used his nickname, "D.J. Hanson." Once again, plaintiffs have not explained why they think this is exculpatory <u>Brady</u> material. Montgomery was not the only person in Rockford who knew that a little boy named Demarcus Hanson had been murdered in 2002.[13]

The third police report is from a 1999 murder investigation during which a witness reported that she heard from another person that Montgomery, the victim's nephew, was one of the individuals who shot in retaliation at the suspect's house. The report was authored by Officer Brass. Plaintiffs have not explained why a report of Montgomery shooting at a house in 1999 is exculpatory. Moreover, the information about Montgomery was not concealed, it was documented in a police report. If plaintiffs' theory of defense was that Montgomery was Demarcus' murderer, then they could have requested all police reports concerning Montgomery from the Rockford Police Department. In any event, the court has not been convinced that this report was <u>Brady</u> material. Even if this report was <u>Brady</u> material, plaintiffs have not identified evidence that any defendant in this case had knowledge of the report such that they could have concealed it. <u>See</u> <u>Colbert</u>, 851 F.3d at 657 ("Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation); <u>see also</u> <u>Marshall</u>, 696 F. Supp. 2d at 969 (granting summary judgment to defendant officers on <u>Brady</u> claim because plaintiff did not put forth evidence to show that they were personally involved in the suppression of evidence). The only evidence plaintiffs offer in this regard is Palmer's refusal to answer on Fifth Amendment grounds when asked at his deposition

---

[13]The court notes that even if the first and second police reports were <u>Brady</u> material, there would be no violation vis-a-vis Johnson and Anderson because the reports and described events occurred after their October 2002 trial.

about his knowledge of this report at the time of Demarcus' murder investigation. However, without other evidence of this fact, the negative factual inference that might be drawn is not sufficient to create a genuine issue of material fact at summary judgment. See LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901.

Moreover, even if these three police reports were exculpatory, there is no evidence of concealment by any defendant because, not surprisingly, these police reports were filed under different case numbers than the case number for the Demarcus Hanson murder investigation. As such, there is no evidence that the failure to turn over these reports to plaintiffs before their respective trials was other than inadvertent. This is another circumstance where criminal and civil Brady claims differ. In the criminal context, Brady applies whether the suppression of evidence is willful or inadvertent. However, although the Seventh Circuit has yet to address the issue directly, the weight of authority is that in a civil § 1983 Brady claim against a police officer, plaintiffs have to show more than mere negligence or inadvertence in failing to turn over Brady material because "the no-fault standard of care Brady imposes on prosecutors in the criminal or habeas context has no place in a § 1983 damages action against a law enforcement official in which the plaintiff alleges a violation of due process." Porter v. White, 483 F.3d 1294, 1306 (11th Cir. 2007); see also Villasana v. Wilhoit, 368 F.3d 976, 980 (8th Cir. 2004) ("[T]he recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair trial."); Jean v. Collins, 221 F.3d 656, 660-61 (4th Cir. 2000). Although there is contrary authority, see Moldowan v. City of Warren, 578 F.3d 351, 388-89 (6th Cir. 2009), this court believes that the Seventh Circuit would agree with the Eleventh, Eighth, and Fourth Circuits. The Seventh Circuit has cited Jean and stated that "police who deliberately withhold exculpatory evidence, and thus prevent the prosecutors from complying with the obligations articulated in Brady, violate the due process clause" without discussing whether any lesser degree of culpability, such as recklessness, would suffice. Newsome v. McCabe, 260 F.3d 824, 825 (7th Cir. 2001). Moreover, its use of the word "concealment" in Cairel, is a strong indicator that an intentional act is required. 821 F.3d at 832. Plaintiffs argue that Iasparro agreed during his deposition that the report concerning the 1999 shooting incident should have been mentioned in a report filed in Demarcus' murder investigation and the prior report number cross-referenced. But this is at best evidence of negligence, not concealment. For all these reasons, plaintiffs' ninth civil Brady claim fails.

### 10. Charles Griffin

Plaintiffs contend that Palmer withheld that he learned in the summer of 2002 that Taylor had admitted to Griffin to committing the Hanson murder. According to plaintiffs, instead of documenting and disclosing this information to the prosecution, Palmer withheld the exculpatory information and informed Griffin that he only wanted information that implicated plaintiffs. In support of this contention, plaintiffs rely on Griffin's affidavit, Griffin's postconviction evidentiary hearing testimony, and Palmer's deposition testimony. But these three sources of evidence are not sufficient to sustain this civil Brady claim. In his affidavit, Griffin does not say that he tried to inform Palmer of Taylor's purported admission and that Palmer was not interested. Instead he said he tried to tell "the police" and "the police" told him if the information was not about plaintiffs they were not interested. In his postconviction evidentiary hearing testimony, Griffin never mentioned Palmer either, he just said he talked a "detective." As a result, even if a trier of fact were to believe

38

that Griffin told a detective about Taylor's purported admission that Taylor and Montgomery committed the murder, Griffin offers no evidence that the detective he told was Palmer. That leaves only Palmer's deposition testimony wherein he asserts his Fifth Amendment privilege when asked whether he interviewed Griffin prior to plaintiffs' trials. But, as has been explained, the negative inference drawn from a defendant's invocation of his Fifth Amendment privilege is not by itself enough to establish a disputed fact for summary judgment purposes. See LaSalle Bank, 54 F.3d at 391; Logan, 891 F. Supp. 2d at 901. Palmer makes no mention of Griffin in his postconviction evidentiary hearing testimony. As such, plaintiffs' tenth withholding-of-evidence due process claim cannot survive summary judgment.

### 11. Antonio Leavy

Plaintiffs claim that Palmer and Stevens withheld Leavy's July 11, 2002 written statement that on the night of Demarcus' murder he heard four gunshots and saw a red four-door Pontiac drive past his house toward Preston with a heavy-set male driving. Plaintiffs maintain that this information is exculpatory because Dowthard and Brown testified at the trials that Ross, a heavy-set black male, was not driving the vehicle but rather Johnson, who is skinny.[14] This argument mischaracterizes the evidence presented at the trials because neither Dowthard nor Brown identified the driver of the red Grand Prix as it left 2514 Chestnut Street, only as it arrived. As such, Leavy's statement about who was driving when the vehicle left had little impeachment value.

In addition, Leavy's statement was not "concealed" by Palmer and Stevens because it was documented in a police report which was filed under the case number for a different investigation. That is, the on-going investigation of the conflict in Rockford between the Moes and the Wacos street gangs and, specifically, a drive-by shooting directed at Leavy and his friends that occurred a week before Demarcus was murdered. In his statement, Leavy related details about a confrontation between him and a member of the Moes named Antwan "Buck" Maxey, that Leavy believed was the drive-by shooter. Leavy's remarks about Demarcus' murder were anecdotal to his account of the drive-by shooting. The court has not been directed to any evidence showing that this was other than inadvertence or a mistake which, as discussed above, is not sufficient to sustain a civil Brady claim. See Porter, 483 F.3d at 1306.[15]

Furthermore, plaintiffs suffered no prejudice as a result of not having Leavy's statement because the statement indicates that, based on what Brown told him, Leavy held the belief that plaintiffs were responsible for the murder. Consequently, the statement on the whole was inculpatory, not exculpatory, and therefore not Brady material. Likewise, plaintiffs also suffered no prejudice in not calling Leavy to testify because Leavy thought that plaintiffs were the shooters. In

---

[14]Actually, only Brown testified that Johnson was driving the red Pontiac when it arrived in front of Dowthard's mother's house, Dowthard did not.

[15]The court notes further that Palmer and Stevens would likely have qualified immunity for any Brady violation resulting from the "withholding" of Leavy's statement. This is because plaintiffs have not identified Supreme Court or Seventh Circuit precedent that clearly establishes that a Brady violation occurs under these circumstances. See District of Columbia v. Wesby, 583 U.S. ___, 138 S. Ct. 577, 589 (2018) (holding that the doctrine of qualified immunity shields police officers in § 1983 actions from liability for money damages unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time").

addition, plaintiffs suffered no prejudice in not calling Leavy because he would have said that the driver of the red Grand Prix was a heavy-set black male and this is not inconsistent with the State's theory that the plaintiffs were the individuals who came to 2514 Chestnut Street in the red Grand Prix and shot into the house. This is because it is undisputed that Ross is a heavy-set black male.

Plaintiffs also claim that Palmer and Stevens withheld that in the same statement Leavy told them that he had a conversation with Brown shortly after the murder and Brown did not say that he was present for the shooting or that he knew who was involved. Indeed, according to the statement, Brown did not say anything about the shooting. This absence of evidence has negligible value to plaintiffs. In any event, this evidence would not impeach Brown because Brown never testified that he was present for the shooting. Instead, Brown testified that he sped away in the Monte Carlo after plaintiffs arrived in the red Grand Prix and, again, after talking to Brown, Leavy concluded, "I figured it was [plaintiffs] that was [sic] probably involved in Demarcus' shooting." Therefore, plaintiffs have not identified sufficient evidence of a <u>Brady</u> claim based on the purported concealment of Leavy's statement.

Based on the foregoing, the court concludes that plaintiffs have failed to identify sufficient evidence to support their eleven § 1983 <u>Brady</u> claims.

## C. Issue Preclusion

Based on this court's conclusion that all of plaintiffs' claims fail on the merits, the court need not address defendants' arguments that all of plaintiffs' due process claims are barred by collateral estoppel because of Judge McGraw's rejection of the same claims during the litigation of plaintiffs' postconviction petitions.

## D. § 1983 Monell, Failure to Intervene, Conspiracy, and Supervisor Liability Claims

Nested within their due process claims in Count I are plaintiff's claims against the City of Rockford brought pursuant to <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978). The above analysis, however, precludes any recovery on any of these claims. <u>See City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) (requiring that plaintiff suffered a "constitutional injury at the hands of the individual police officer" for <u>Monell</u> liability to attach). Similarly, if there is insufficient evidence to support plaintiffs' § 1983 due process claims that defendants violated their rights by fabricating or withholding evidence, then there is insufficient evidence to support plaintiffs' failure to intervene claims and conspiracy claims against any individual defendant or the City of Rockford. <u>See Smith v. Gomez</u>, 550 F.3d 613, 617 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in § 1983 actions."); <u>Harper v. Albert</u>, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation."). The same analysis holds with respect to the § 1983 supervisor liability claims in Count VII. If there is insufficient evidence to support an underlying constitutional violation, then there is no evidence to support supervisory liability for that violation. <u>See Gossmeyer v. McDonald</u>, 128 F.3d 481, 495 (7th Cir. 1997); <u>Charles v. City of Chicago</u>, No. 16-CV-679, 2018 WL 318484, at *10 (N.D. Ill. Jan. 8, 2018). Thus, defendants are entitled to summary judgment on Counts II, III, and VII.

## E. Malicious Prosecution under § 1983

Defendants contend that plaintiffs' claim in Count VIII for malicious prosecution under § 1983 is barred because "[t]he existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution." Newsome v. McCabe, 256 F.3d 747, 750 (7th Cir. 2001), abrogated on other grounds by Manuel v. City of Joliet, Ill., 580 U.S. ___, 137 S.Ct. 911, ___ (2017). Plaintiffs contend that Manuel abrogated Newsome, and held that a claim for unlawful pretrial detention is actionable under the Fourth Amendment.

Since the parties filed their briefs, the Seventh Circuit has explained that:

> We said in Newsome v. McCabe, 256 F.3d 747 (7th Cir. 2001), that there is no free-standing constitutional tort of malicious prosecution, though there are other constitutional rights (e.g., such as those under the Due Process Clause and the Fourth Amendment) that protect people against abusive arrests, fabrication of evidence, etc. While Manuel rejected some aspects of Newsome's holding, nothing in Manuel changed the general rule that the federal constitution does not codify state tort law. But in this case, the fact that the plaintiffs have used the terminology "malicious prosecution" is of no moment. What matters is whether they have identified the constitutional right at issue, and they have done so. The Fourteenth Amendment's Due Process Clause is the relevant constitutional source; it forbids the state from depriving a person of liberty (including by pre-trial detention) based on manufactured evidence.

Hurt v. Wise, 880 F.3d 831, 843 (7th Cir. 2018). It is now clear that there is no free-standing constitutional tort of malicious prosecution. Plaintiffs' § 1983 claims do not cite to any federal constitutional provision but, rather, parrot the elements of state-law malicious prosecution. It is also clear that the federal constitution does not codify state tort law and that a § 1983 claim based on the elements of state-law malicious prosecution does not exist. Id. To the extent that Count VII is based on the same Fourteenth Amendment due process violations that are alleged in Count I, it is merely redundant of that claim, no matter how it is styled, and is therefore superfluous. For these reasons, defendants are entitled to summary judgment on Count VIII.

## F. Remaining Claims

Count IX sets forth a state law claim for malicious prosecution. To establish a claim for malicious prosecution under Illinois law, a plaintiff must establish, among other elements the absence of probable cause. Johnson v. Saville, 575 F.3d 656, 659 (7th Cir. 2009). "[P]robable cause is not determined by retrospect. It depends on what the police know, or reasonably believe at the time." Bridewell v. Eberle, 730 F.3d 672, 675 (7th Cir. 2013). When plaintiffs were arrested on or about June 30, 2002, defendants reasonably believed that they were the murderers based on the accounts given by Dowthard and Brown. Based on the written statements of Dowthard and Brown alone, defendants had probable cause. As discussed above, plaintiffs have failed to present evidence showing that defendants had a reason to doubt that Dowthard and Brown were credible witnesses, and an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause. Woods v. City of Chicago, 234 F.3d 979, 996 (7th Cir. 2000). "It is axiomatic that the existence of probable cause is a complete defense to a malicious prosecution claim." Logan

v. Caterpillar, Inc., 246 F.3d 912, 926 (7th Cir. 2001). Accordingly, the court grants defendants summary judgment on Count IX.

Count X alleges IIED under Illinois law. The elements of the Illinois tort of IIED are: (1) extreme and outrageous conduct, (2) the intention to, or knowledge of a high probability that the conduct would, cause severe emotional distress, and (3) the conduct actually caused severe emotional distress. Zoretic v. Darge, 832 F.3d 639, 645 (7th Cir. 2016). This court has already determined that there is insufficient evidence to support plaintiffs' claims of evidence fabrication and withholding of exculpatory or impeachment evidence. Because plaintiffs rely on the same evidence to support the "extreme and outrageous" conduct element of their IIED claim, it fails for the same reasons. Therefore, defendants are entitled to summary judgment on Count X.

Plaintiffs also bring claims of respondeat superior in Count XI. A claim of respondeat superior requires a surviving underlying claim against an employee. See Huon v. Mudge, 597 F. App'x 868, 877 (7th Cir. 2015) (citing Lawlor v. N. Am. Corp. of Ill., 2012 IL 112530). Because the court has already determined that all individual defendants are entitled to summary judgment on all claims against them, there is no basis for respondeat superior liability against these defendants. Consequently, defendants are entitled to summary judgment on Count XI.

In Count XII, plaintiffs bring claims for indemnification against the City of Rockford pursuant to 745 ILCS 10/9-102, which states in pertinent part that, "[a] local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages . . . for which it or an employee while acting within the scope of his employment is liable in the manner provided in this Article." Because the court has determined that defendants are entitled to summary judgment on all claims brought against them, there is no underlying liability to support plaintiffs' claims for indemnification, and the City of Rockford is therefore entitled to summary judgment on Count XII.

### III. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted. These cases are closed.

Date: 5/23/2018

ENTER:

FREDERICK J. KAPALA

District Judge