UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| LUMONT JOHNSON and ANTHONY ROSS, | |
| Plaintiffs, | No. 15 C 50064 |
| TYJUAN ANDERSON, | |
| Plaintiff, | No. 15 C 50065 |
| v. | |
| CITY OF ROCKFORD; DOUG PALMER; JOSEPH STEVENS; and SCOTT MASTROIANNI, | Judge Thomas M. Durkin |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

In these two related cases (which the Court will refer to as one), Plaintiffs originally alleged that twelve Rockford police officers framed them for a murder for which Plaintiffs were convicted and subsequently exonerated. Judge Kapala's decision granting summary judgment in favor of all defendants on all claims was partially reversed by the Seventh Circuit. *See Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019). In light of that decision, the Court ordered the parties to submit reports stating their positions on what claims and defendants remained in the case. After review of those reports, the Court ordered that the following claims and defendants would proceed to trial:

> (1) the claim by all three plaintiffs that defendant [Doug Palmer] fabricated evidence pertaining to the testimony of witnesses Alex Dowthard and Lataurean Brown;

(2) the claim by all three plaintiffs that defendants [Joseph Stevens] and [Scott Mastroianni] failed to disclose impeachment evidence offered by witness Rickedda Young;

(3) the claim by all three plaintiffs that defendant Palmer failed to disclose the circumstances surrounding witness Bryce Croft's statement;

(4) the claim by all three plaintiffs that defendants Stevens and Palmer failed to disclose the improper police tactics that produced witness Brown's statement;

(5) the claim by plaintiffs Johnson and Anderson that defendant Stevens failed to timely disclose the recordings of witness Dowthard's jailhouse telephone calls; and

(6) the claims for failure to intervene and conspiracy based on the underlying due process claims.

R. 296 at 1-2.[1]

At a status hearing held six days later, Plaintiffs did not object to the Court's order or indicate that they might seek reconsideration. Counsel for the dismissed defendants raised the issue of entry of partial judgment for those defendants under Federal Rule of Civil Procedure 54(b), and the Court invited counsel to submit a proposed order. Plaintiffs did not object to that contemplated process either.

In accordance with what had been discussed during the status hearing, the dismissed defendants filed a motion for entry of partial judgment. Plaintiffs also submitted a proposed order to the Court's electronic in-box. The Court reviewed both

---

[1] Record citations will be to case 15 C 50064 unless otherwise noted.

submissions and granted the dismissed defendants' motion and entered judgment in their favor.

That same day, immediately after the Court's entry of judgment, Plaintiffs filed a motion under Federal Rule of Civil Procedure 59(e) to alter the judgment so as to return defendant James Randall to the case under a theory of conspiracy liability. R. 301; 15 C 50065, R. 288. The Court requested further briefing on the issue. In their brief, Plaintiffs argue that "[t]here is ample evidence in the record demonstrating that Randall can be held liable as a conspirator to frame Plaintiffs for the Hanson murder," and that they "should be given a trial on whether Defendant Randall conspired to frame them for the Hanson murder." R. 308 at 8. Randall filed a brief in opposition, R. 313, and Plaintiffs filed a reply, R. 315-1.

**Background**

We are here because Demarcus Hanson—an eight-year-old boy sleeping in his grandmother's house—was killed by gunshots fired into her Rockford home on April 14, 2002. The police focused their investigation of Demarcus's murder on a shoot-out that same night between Demarcus's uncle, Alex Dowthard, and the plaintiffs in this case. Despite this altercation, Dowthard initially maintained that the shootout did not take place near his mother's house, and that he did not know who could have fired the shots that killed his nephew. Plaintiffs allege, however, that Palmer threatened and coerced Dowthard (and another man who was with Dowthard at the time of the shooting, Lataurean Brown) into stating and testifying (i) that Plaintiffs fired shots at them while they were at the house where Demarcus slept, and (ii) that Plaintiffs

3

were driving a red car at the time (the use of a red car by the shooters being in accord with other witness accounts). Dowthard's and Brown's testimonies were the primary evidence used to convict Plaintiffs.

Plaintiffs also claim that Defendants and the dismissed defendants fabricated and covered-up additional evidence in an effort to frame Plaintiffs. Particularly relevant to this motion is Plaintiffs' allegation that Palmer covered-up a witness statement (by a man named Bryce Croft) implicating two other men (Casel Montgomery and Kefentse Taylor) in Demarcus's murder. That alleged cover-up is one of the five Due Process claims going to trial in this case. Palmer testified that he told Randall and other officers that Croft implicated Montgomery. R. 249-8 at 55 (93:11-17). Plaintiffs contend that Randall then helped fabricate a statement by Montgomery implicating Plaintiffs. Plaintiffs argue that Randall's actions to fabricate Montgomery's statement are evidence of his agreement to cover-up Croft's statement implicating Montgomery such that a reasonable jury could find Randall liable for conspiracy to cover-up Croft's statement.

Plaintiffs base that claim on the following evidence. As of the date Randall first interviewed Montgomery (April 26, 2002), investigators knew from witnesses who lived near Demarcus's house that the shots were fired from a red car. Randall also knew that Montgomery was in possession of a red rental car that night and that he did not have an alibi for the time of the murder. Randall's report of his interview states that Montgomery told him that he saw Plaintiffs in possession of guns the night of the murder, but that they were driving two cars, one black and one white.

4

*See* R. 308-3 at 9-10. Contrary to Randall's report, Montgomery testified at his deposition that he did not tell Randall any of this information. *See* R. 308-4 at 83:12-16; 84:13-18; 85:1-11; 85:21–86:1. Nevertheless, there is other evidence (e.g., Dowthard's initial statement) that Plaintiffs possessed guns that night and were driving a white car. *See* R. 249-34 at 6.

Randall interviewed Montogmery again on May 23, 2002, this time along with Defendant Stevens. Plaintiffs contend that at this interview, Randall and Stevens attempted to coerce Montgomery into making a statement implicating Plaintiffs. Plaintiffs argument rests on the following testimony Randall gave at his deposition:

> Q: Specifically what Detective Stevens was telling Casel Montgomery was tell us that [Plaintiffs] have your car, your rental car at the time of the Demarcus Hanson shooting, correct?
>
> A: Yes.

R. 308-1 at 83 (266:17-23). Plaintiffs argue that because Randall and Stevens knew that a red car was used in the murder; that Montgomery was in possession of a red car that night; and that Plaintiffs were not driving a red car, Randall and Defendant Stevens's attempt to coerce Montgomery into stating that Plaintiff Ross had taken Montgomery's red car that night can only be seen as an effort to frame Plaintiffs. But as Judge Kapala noted in his summary judgment opinion, Plaintiffs' interpretation of Randall's answer as an admission that he and Stevens coerced Montgomery into stating that he had given Plaintiffs his red car is a "mischaracterization." *See* R. 267 at 29. True, Randall admitted that he and Stevens were trying to convince Montgomery that they knew he had given Plaintiffs his red car as an interrogation

5

tactic. But he also noted during his deposition that his report of the interview stated that he "told Montgomery that we knew [Plaintiffs] were in his car and *I just wanted to know what he knew about that night.*" *See* R. 308-1 at 82 (265:21-24) (emphasis added). Randall never testified that he and Stevens threatened Montgomery or tried to coerce him to make a particular statement falsely implicating Plaintiffs. Indeed, Randall testified that Montgomery maintained during the interview that Plaintiffs *did not* use his red car that night. *Id.* at 81 (264:10-14).

Nevertheless, Plaintiffs contend that what they perceive to be Randall and Stevens's initial attempt to coerce Montgomery to make a false statement culminated in Palmer and Stevens fabricating the statement they wanted. On August 27, 2002 (after an interview for which Randall was not present), Montgomery gave Palmer and Stevens a written statement saying that he (Montgomery) gave Plaintiff Ross his red car. *See* R. 249-46 at 2. Montgomery later stated in an affidavit that Palmer coerced him into making the statement. *See* R. 249-5. And at his deposition Montgomery initially testified that Palmer threated him, R. 249-6 at 33:10–34:25, and that the signature on the statement he purportedly gave to Palmer wasn't his, *id.* at 22:12-21. But then during the second day of his deposition, Montgomery invoked his Fifth Amendment right to refuse to answer when asked if Palmer (or Randall) told him to say that Ross took his red car. *See* R. 249-17 at 106 (264:3-17), 120 (278:9-15).

In addition to Randall's involvement in questioning Montgomery, Plaintiffs allege that Randall coerced a statement from an alibi witness for Plaintiff Ross. Randall and Palmer interviewed Toni Gulley who told them that Ross returned home

6

by 2:45 a.m. the night of the murder, which made it unlikely that Ross could have committed the murder. Palmer testified at an evidentiary hearing on Plaintiffs' motion for a new trial in their criminal case that he and Randall threatened Gulley with the removal of her children if she did not change her story. *See* R. 249-8 at 26-27. Palmer took the Fifth when asked about this topic at his deposition in this case. *See* R. 249-9 at 98:8-19.

**Analysis**

This evidence tends to show that Randall participated in acts of evidence fabrication and cover-up and knew about other such acts committed by Defendants. However, Judge Kapala held, and the Seventh Circuit affirmed, that this evidence was insufficient for a reasonable jury to find Randall directly liable for Due Process violations because: (1) Montgomery's allegedly coerced or fabricated statements were not used against Plaintiffs at their trial; and (2) Gulley did not adopt the statement she was initially coerced to make, instead testifying truthfully at trial.

Nevertheless, even though Randall cannot be found liable for committing the Due Process violations themselves, that does not eliminate the possibility that he is liable for conspiracy to fabricate and cover-up evidence. "A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his

7

constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights. *Id.*

The Seventh Circuit has already held that there is sufficient evidence to merit a trial on several overt acts in this case. The question is whether the evidence of Randall's knowledge and actions is sufficient for a reasonable jury to find that he agreed to commit those acts. To prove an agreement, Plaintiffs must establish that Randall "underst[ood] the general objectives of the scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do [their] part to further them." *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 939 (7th Cir. 2012). The evidence must be "sufficient to raise the inference of mutual understanding (i.e., the acts performed by the members of a conspiracy are unlikely to have been undertaken without an agreement)." *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000). "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Beaman*, 776 F.3d at 510.

The evidence shows that Randall knew: (a) that a red car was used in the murder; (b) that Dowthard's statement that Plaintiffs had a red car was coerced; (c) that Croft had implicated Montgomery; (d) that Montgomery had a red car; and (e) that Palmer was coercing witnesses in the case, since Randall allegedly witnessed Palmer threaten Gulley. Plaintiffs argue that despite this knowledge, Randall improperly tried to convince Montgomery to state that he gave his red car to Ross. And further, knowledge of these facts means that Randall also necessarily knew that

8

when Montgomery changed his story to say that he had given his red car to Ross, he was either lying or had been coerced by Palmer and Stevens.

Some courts in this district have allowed similar claims to reach a jury. *See*, *e.g.*, *Fields v. City of Chicago*, 2014 WL 477394, at *10 (N.D. Ill. Feb. 6, 2014) ("But the circumstances, particularly the involvement of different witnesses who dealt with a group of defendants who were co-workers, are unusual enough that a jury reasonably could conclude that the defendants acted in concert and that these were not independent actions."); *Collier v. City of Chicago*, 2015 WL 5081408, at *10 (N.D. Ill. Aug. 26, 2015) ("[A]bsent a conspiracy, it would be a challenge to imagine a scenario in which each officer independently engaged in wrongdoing during the search that helped manufacture probable cause and then covered it up with later false testimony."). Others have granted summary judgment to defendants. *See Grayson v. City of Aurora*, 157 F. Supp. 3d 725 (N.D. Ill. 2016); *Wrice v. Burge*, 187 F. Supp. 3d 939 (N.D. Ill. 2015). But those courts found that there was no "circumstantial evidence" of agreement "aside from the *Brady* violations themselves." *Grayson,* 157 F. Supp. 3d at 744-45; *see also Wrice*, 187 F. Supp. 3d at 955 ("Nothing in the complaint plausibly suggests that Wrice's coerced confession was part of a grand conspiracy among nine state actors, seven of whom were unaware of the underlying coercion and three of whom did not assume office until years after Wrice's trial."). Here, the Court finds that the totality of the evidence is sufficient for a reasonable jury to find that Randall agreed with Defendants to fabricate and cover-up evidence to Plaintiffs' detriment.

9

However, much of this evidence is hearsay statements by Montgomery, and testimony and statements by Palmer and Montgomery who have since invoked their Fifth Amendment right not to testify on these topics. Judge Kapala found this evidence inadmissible in granting summary judgment to Randall and the other dismissed defendants:

> Plaintiffs have not informed the court how any prior statements, affidavits, or testimony by Montgomery would be admissible at trial such that it can be relied upon now in the summary judgment analysis. . . . [And] no hearsay exception is apparent. In contrast to Palmer's prior testimony, for example, which might be admitted as an opposing party's statement under Rule 801(d)(2), Montgomery's prior testimony and statements are inadmissible hearsay. See Fed. R. Evid. 801(c) & 802.
>
> The court has considered on its own accord whether Montgomery's prior testimony and statements could be admitted as prior inconsistent statements under Federal Rule of Evidence 801(d)(1)(A). Under that Rule, a prior statement of a witness who testifies at trial and is subject to cross-examination about the prior statement is not hearsay if the statement is inconsistent with the declarant's testimony. Fed. R. Evid. 801(d)(1)(A). However, the requirements of Rule 801(d)(1)(A) would not be met at trial with respect to Montgomery's prior testimony. By invoking his Fifth Amendment privilege in response to questions about his prior statements, Montgomery will not be properly subjected to cross-examination regarding those prior statements. . . . The court has also considered . . . three [additional] hearsay exceptions . . . . Because Montgomery refused to answer questions during his deposition he will not be able to testify at trial and, consequently, plaintiffs' would be unable to establish the Rule 803(5) recorded recollection foundation requirement that he lacks recollection. No one would take the position that deposition testimony could qualify as a business record and a prior written statement from a third party, even if documented in a police report, does not qualify as a business record. Plaintiffs would also be unable to admit

> Montgomery's prior statements under the Rule 807 residual exception because Montgomery's prior statements do not have "circumstantial guarantees of trustworthiness" as he is also a felon and a gang member who has given inconsistent accounts during the course of this case. Thus, plaintiffs have failed to establish how any of Montgomery's prior statements, affidavits, or deposition testimony create a genuine issue of material fact on this fabrication-of-evidence due process claim.
>
> Plaintiffs also claim that Randall's deposition testimony establishes that Stevens told Montgomery to say that plaintiffs were in his red rental car at the time of the shooting. This is a mischaracterization of the record. During his deposition, Randall agreed that he was present when Stevens told Montgomery that he, Stevens, and Randall knew that plaintiffs were in his car at the time of the shooting. Randall did not agree that Stevens told Montgomery what to say.
>
> Plaintiffs are left only with Palmer's refusal on Fifth Amendment grounds to answer questions at his deposition about his procurement of Montgomery's August 27, 2002 statement. However, this evidence could only be used against Palmer, not Stevens and Randall, and for Palmer there would have to be other evidence to support the inference in order to withstand summary judgment. As such, there has been an inadequate showing by plaintiffs of admissible evidence that Montgomery's August 27, 2002 written statement was fabricated.

R. 267 at 28-29 (citations omitted). The Court tends to agree with Judge Kapala's reasoning. And since the evidence of a Due Process violation based on coercion of Montgomery's statement is the same evidence Plaintiffs use to make their conspiracy claim against Randall, Judge Kapala's exclusion of that evidence should also require denial of Plaintiffs' motion to return Randall to the case. The evidence that Randall knew that Palmer threatened Gulley is also based on Palmer's prior testimony during the evidentiary hearing in the criminal case, *see* R. 308 at 7, which also would be

11

implicated by his invocation of the Fifth Amendment. If the primary evidence against Randall is not admissible, Plaintiffs' conspiracy claim against him can't go to trial.

However, Plaintiffs did not address this reasoning in their brief. Furthermore, whether Palmer's testimony will be admissible at trial and for what purposes has implications for the claims against Defendants that are already going to trial. For these reasons, the Court will give Plaintiffs the opportunity to file a brief of no more than ten pages, due by January 15, 2020, addressing the admissibility of the evidence discussed in this order, with a response from Randall due January 29, 2020. The Court will reserve ruling on Plaintiffs' motion to reconsider [301] [15 C 50065, 288] until then. Plaintiffs should be prepared at the status hearing on December 18, 2019 to discuss whether they intend to file such a brief or they will no longer pursue a claim against Randall.

ENTERED:

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: December 17, 2019